# EXHIBIT K

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION

 3  BAY POINT CAPITAL PARTNERS      )
    II, LP,                         )
 4                                  )
                    Plaintiff,      )   CRIMINAL ACTION FILE
 5           v.                     )   NO. 1:21-CV-00375-MLB
                                    )
 6  HOPLITE, INC. ET AL,            )
                                    )
 7                  Defendants.     )
    _____)
 8

 9

10  -----------------------------------------------------------

11          BEFORE THE HONORABLE MICHAEL L. BROWN
                 TRANSCRIPT OF PROCEEDINGS
12                  FEBRUARY 10, 2021
    -----------------------------------------------------------
13

14

15

16
          Proceedings recorded by mechanical stenography
17         and computer-aided transcript produced by

18
           JANA B. COLTER, FAPR, RMR, CRR, CRC
19                Official Court Reporter
                  1949 U.S. Courthouse
20                75 Ted Turner Drive, SW
                  Atlanta, Georgia  30303
21                   (404) 215-1456

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

2

```
 1   APPEARANCES:

 2
     For the Plaintiff:        HARRIS B. WINSBERG
 3                             ALEXANDRA SPEAR PEURACH
                               CHRISTOPHER KELLEHER
 4                             Attorneys at Law

 5   For the Defendant:        LOUIS R. COHAN
                               FELISHA PATEL
 6                             EMILY COHAN
                               Attorneys at Law
 7
     For Porta Pellex:         JOHN ELROD
 8                             KRISTOPHER LARSON
                               Attorneys at Law
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          INDEX TO EXAMINATIONS

2   WITNESS                                              PAGE

3   CHANDLER RIERSON

4   Direct Examination By Ms. Peurach                  23

5   Cross-Examination By Mr. Cohan                     91

6   Redirect Examination By Ms. Peurach               118

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

EXHIBIT K
PAGE 314

```
 1      (Atlanta, Fulton County, Georgia, March 24, 2021, in open
 2   court.)
 3                             —  —  —
 4                      P R O C E E D I N G S
 5                             —  —  —
 6
 7           THE COURT:  All right.  Good afternoon, everyone.
 8           MR. WINSBERG:  Hi, Judge.
 9           MS. PEURACH:  Good afternoon.
10           MR. COHAN:  Good afternoon.
11           THE COURT:  We are here for a hearing on an emergency
12   motion for a receiver in Bay Point v. Hoplite.
13           Did I say that right?
14           MR. COHAN:  You did.
15           THE COURT:  Great.  21-CV-375.
16           Can I have appearances, starting with counsel for the
17   plaintiff?
18           MR. WINSBERG:  Good afternoon, Your Honor.  Harris
19   Winsberg, Alex Peurach and Chris Kelleher from Troutman Pepper
20   here for the plaintiff.
21           THE COURT:  Great.
22           And for the defendant?
23           MR. COHAN:  Louis Cohan, Your Honor, appearing
24   specially, reserving objections to personal jurisdiction and
25   venue on behalf of all three defendants.
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1            THE COURT:  Very well.

2            And I understand we have somebody from Columbia State

3    Bank; is that right?

4            MS. GODFREY:  Yes, Your Honor.  Good afternoon.

5    Gwendolyn Godfrey from the Polsinelli Law Firm on behalf of

6    Columbia State Bank.

7            THE COURT:  Great.  Okay.  Tell Mr. McAvoy I said hi.

8            MS. GODFREY:  I will do so, Your Honor.  Thank you.

9            THE COURT:  And I understand that Mr. Rierson is here

10   as well.

11           MR. WINSBERG:  Yes, Your Honor.

12           THE COURT:  Okay.  All right.  So in preparation for

13   today, I have read the things that you-all have filed on both

14   sides.  I think I understand the core concept of what happened,

15   that is that the plaintiff provided a short-term loan to the

16   defendant and the defendant did not pay as was required.

17           There was some discussion about what was going on and

18   then the allegation is that a falsified email was sent by

19   somebody associated with the defendant to, I think,

20   Mr. Rierson, that he uncovered as fraudulent, and as part of

21   that, that led him to determine that at least one of the

22   agreements that he had relied upon that was part of the

23   collateral was also falsified.

24           And that there were some forbearance agreements that

25   were executed, I suppose to try to stop the bleeding or fix a

EXHIBIT K
PAGE 316

1   bad situation, that they did not do what was intended, and

2   therefore, the plaintiff has now filed a lawsuit and seeks

3   receivership.

4         I know there's lots more details to this.  I've read

5   all of that.  And I'm happy to listen to it.

6         The defendant makes a couple of points that I want to

7   make sure that we address, and then I'll turn it over to the

8   parties to do what they want.  One of their issues -- I'm going

9   to pull up some of my notes.  It's so much easier to look on my

10   big monitor.

11         They say, for example, that the agreement with I

12   think it's Screen Media -- is that the primary one that's

13   allegedly falsified?

14         MR. COHAN:  That's right.

15         THE COURT:  That there was no expectation there

16   because there was no guarantee of a receivable, and I think

17   they contend the same with the others.  I have looked at the

18   others.  The others with the fight group and then with I think

19   is it Big something?

20         MR. WINSBERG:  Big Media.

21         MR. COHAN:  Big Media.

22         THE COURT:  Those two look like they set a time for

23   payment somewhere in the future.  I'm keeping the one I most

24   immediately read was the fight one, which is $200,000 within a

25   certain time of production beginning, and then $800,000 upon

1  delivery, which obviously would suggest a future action.  It

2  would be hard to establish -- at least I don't think there has

3  been a claim of fraud in that.

4          The other one, though, with Screen Media does seem

5  that there is an expectation, but I want to hear more on that,

6  because you-all have a dispute there, in that you say it was

7  something that you relied upon, that it was something already

8  payable or that was setting up an account receivable, they say,

9  that is the defendant, says, no, that's not true, so I want to

10 hear about that.

11         I want to hear about if there is any dispute that

12 there is, in fact, a default.

13         I want to hear about whether the forbearance

14 agreements have the impact that the defendant says they have.

15         And then I want to hear a little bit more about what

16 the plaintiff believes is the imminency of the damage if I

17 don't do something.  I mean, I know you have to establish that

18 as part of your proof.

19         They say there's no immediacy to it because there's

20 no money coming in, and they also say, on the other hand, if

21 you do this, it will destroy our company.  So I want to hear

22 about that dispute.

23         Isn't that essentially what you say, Mr. Cohan, that

24 there is no money coming in so there's nothing to receive over?

25         MR. COHAN:  Exactly right, Your Honor.  Thank you.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1              THE COURT:  Because these are all somewhere in the
 2   future?
 3              MR. COHAN:  Correct.
 4              THE COURT:  Okay.  And for you, I want to hear if
 5   there is any logical explanation for that email and for what
 6   appears to be an altered agreement.  Your response might be it
 7   happened, but it doesn't matter.  That's kind of what I think
 8   your written response was.
 9              But from some of the cases I looked at, it looked
10   like if they can establish some level of reliance that they
11   might have hit the fraud element on the head.
12              But at any rate, I'll stop there and I'll turn it
13   over to the parties to talk about.
14              MR. WINSBERG:  All right.  Thank you, Your Honor.
15   Would you prefer me at the podium, Your Honor?
16              THE COURT:  Why don't you stay there, if that's okay.
17              MR. WINSBERG:  Okay.  And I'll try to speak up,
18   Your Honor.  It's difficult with a mask.
19              THE COURT:  I know.
20              MR. WINSBERG:  I think Your Honor hit a lot of the
21   issues on the head that we are prepared to address today.  We
22   did print off some exhibit binders for the Court and we're
23   happy to pass those up to the Court.
24              THE COURT:  That's fine.  That's fine.  I probably
25   have the documents up already, but in case, maybe it's easier
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1   to flip through it.  That's fine.
 2              MR. COHAN:  And, Your Honor, for the record, we did
 3   object to the use of any additional evidence over and above
 4   what was attached to the complaint and the emergency motion,
 5   and of course some additional exhibits were submitted
 6   yesterday, and we -- we object to the use of those exhibits.
 7              And then to the extent Mr. -- I don't know if there
 8   is going to be an effort to have Mr. Rierson testify live, but
 9   we would object to that as well.
10              THE COURT:  On what basis would you object to that?
11              MR. COHAN:  We think it's unfair and prejudicial,
12   because we haven't had an opportunity to investigate and
13   respond, and given that this is an emergency motion with
14   shortened timeframes for response to begin with, it really --
15   you know, it just puts us in a position where we can't
16   effectively respond.
17              THE COURT:  Okay.  Well, they have a burden here.
18              MR. COHAN:  Right.
19              THE COURT:  And I'm going to let them try to meet it
20   whatever way they can.  If there's some real prejudice that you
21   think you're facing, I mean, it may be that if he doesn't
22   testify, or maybe that he does, that he sort of goes right down
23   the middle of what's already been alleged.  We'll have to see
24   what happens.  Okay?  But you can bring that up, if you think
25   you are hearing something that is unfair to respond to, you can
```

**EXHIBIT K**
**PAGE 320**

1   let me know.

2          MR. WINSBERG:  Your Honor, I'd just start off and

3   thank the Court for the time today, setting the hearing down.

4   And while it's challenging, it is nice to feel like a real

5   lawyer again, to put a suit on and be in a courtroom.

6          THE COURT:  I know.  And I appreciate y'all agreeing

7   to doing it this way.  As I was looking through things

8   yesterday, I thought it would be better to have everybody here,

9   so I appreciate the flexibility.

10         MR. WINSBERG:  As Your Honor is aware and has already

11  articulated, we're here today on our plaintiff's emergency

12  motion to appoint a receiver.  At the Court's direction, we

13  filed a proposed order on that receiver, and that's found at

14  Docket Number 22.  And as the Court will see from that proposed

15  order, we are proposing Marshall Glade from B. Riley, formerly

16  of GlassRatner, to be the proposed receiver.  And I see

17  Mr. Glade in the courtroom, actually, in the very back.

18         THE COURT:  Okay.

19         MR. WINSBERG:  Your Honor got the general gist of the

20  facts.  We, plaintiff, made a $2 million loan to two defendant

21  borrowers, Hoplite and Hoplite Entertainment, which was

22  guaranteed by Mr. Smith.  The documents were entered into on

23  September 30th, 2020.  And the loan is structured as what we

24  term a bridge loan, meaning it was designed to provide

25  immediate liquidity to the defendant borrowers, who are

1  allegedly in the TV and film content business, and was required

2  to be paid back on the maturity date or stated maturity date,

3  December the 30th, so we're talking a three-month loan.

4        The loan, as the Court has already recognized, was

5  collateralized by -- primarily by three different accounts

6  receivable, from Big Media, Big Media Holdings, Fight Channel

7  Network and Big Screen Media, that the defendants represented

8  to be in the aggregate of $3.4 million to be paid quickly back

9  to the borrower defendants after the loan closed, and you'll

10  hear testimony on that point that Your Honor has raised.

11        This is known in the loan documents as the specified

12  collateral, and you'll find that concept in the loan document,

13  which is Exhibit E, at Page 7.

14        THE COURT:  Yes.

15        MR. WINSBERG:  The loan was also collateralized by a

16  blanket lien, as provided in Paragraph 4.1(a), which is also on

17  page -- which is on Page 7 of Exhibit E, and you'll see the

18  grant of the collateral, you'll see the reference to specified

19  collateral, and then general collateral in the granting

20  section.

21        As a condition to making the loan, the plaintiffs

22  were required -- and that's found, these conditions precedent

23  and subsequent, conditions precedent under 3.1 of the loan,

24  Page 15, required various third parties to sign subordination

25  agreements, which the defendants obtained from those third

1    parties to the plaintiff.

2           And there were three buckets of those subordination

3    agreements.  There was, one, related party loans, which is

4    Hoplite Studios, which is an affiliate of the defendant

5    borrowers, and Mr. Smith actually made a loan to the companies.

6           Two, there were third-party loans from various

7    parties including -- and I may get this wrong -- Turpera Group,

8    LeAnn Trust Group, capital -- 23 Capital and Portapelics, if

9    I've got that right.

10           And then finally, there was an SBA loan, which is

11    referenced in the loan documents on Page 7 as well as in our

12    complaint, which is Ms. Godfrey's client, Columbia State Bank,

13    all of which allegedly executed subordination agreements in

14    favor of my client.

15           My client, the plaintiff, filed a UCC-1 perfection

16    statement as an all asset lien, that's the mechanism under

17    Article 9 to perfect your lien on the collateral against both

18    defendant borrowers on October 1.  And you'll find the UCC as

19    Exhibit P in our -- in our exhibit book, as well as it's also

20    referenced -- we attached lien searches, updated lien searches,

21    for both borrower defendants, and that can be found as

22    Exhibit Q and Exhibit R.  So the plaintiff has properly

23    perfected a lien on the borrower's assets.

24           We would note, Your Honor, that we believe we had a

25    properly perfected first priority lien, particularly on the

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  specified collateral, but based on facts we've learned after

2  the loan closed, including a new blanket lien filing that was

3  filed on December 8th, 2020, by Bondit -- and you can find the

4  Bondit security, the lien that was filed on Exhibit R, we ran

5  the updated lien searches at Page --

6          THE COURT:  What exhibit did you say?

7          MR. WINSBERG:  Exhibit R, Your Honor.

8          THE COURT:  R, okay.

9          MR. WINSBERG:  And if you go to the third page in,

10  you'll see on the front of the cover, the UCC all asset filing

11  by Bay Point, but in the back of that page, you'll see there

12  was a new UCC filed after the loan closed, after it's in

13  default by Bondit, which is a blanket lien that got filed,

14  which was new to us.

15          And more importantly, we received an email last night

16  from the counsel for the SBA lender, Columbia Bank, in that

17  email, Your Honor, we attach as Exhibit V.

18          MR. COHAN:  And, Your Honor, we do object to that.

19  It's hearsay, it's unauthenticated.  We didn't see that until

20  just now.  They didn't even provide it last night.

21          MR. WINSBERG:  It took us more than a second to

22  digest it.  But in any event, we got an email last night at

23  8:00 p.m., and that's Exhibit V, and in part, you'll see in the

24  email that Columbia Bank's counsel is representing that -- and

25  I quote -- the subordination agreements that Columbia Bank

1    executed, which are found in Exhibit M in your binder, are,

2    quote, falsely fabricated, do not contain signatures of

3    representatives of Columbia Bank, are not part of the loan

4    documents between Columbia Bank and Hoplite, are not authorized

5    by Columbia Bank and are ineffective.

6            THE COURT:  Okay.  And that's why you are here,

7    Ms. Godfrey?

8            MS. GODFREY:  Yes, Your Honor.  That's one reason.

9    Thank you.

10           THE COURT:  Okay.  And that means that contrary to

11   your client's expectations, the bank did not agree to

12   subordinate their interest?

13           MR. WINSBERG:  It appears that way, based upon the

14   representation, Your Honor.  And why that's important, while

15   there's no debate --

16           THE COURT:  Mr. Cohan, do you have any response to

17   that?

18           MR. COHAN:  I don't.  I didn't even know that was an

19   issue until just now.

20           THE COURT:  Until literally we walked into this

21   courtroom?

22           MR. COHAN:  Five minutes ago.

23           THE COURT:  Okay.  Sorry.  Go ahead.

24           MR. WINSBERG:  No.  I'm sorry, Your Honor.

25           And based upon the new information, while we clearly

1  have a properly perfected security interest, we don't know the

2  order of priority on all -- part of the collateral at this

3  point in time, and that matters, Your Honor, because as an

4  officer of the Court, we had in the proposed order on Pages 6

5  and 7, which is -- I think it was Docket Number 22, in

6  Paragraph 20, we referenced in two different places in the

7  order that we have a first priority security interest in the

8  collateral, and we can't ask Your Honor to make that finding

9  today.  Okay.  Let me ask you this, though, how is it that the

10 other entity -- it's Exhibit R you said.

11         THE COURT:  How is it that Bondit filed that?  They

12 filed it when?  You said in December?

13         MR. WINSBERG:  December.

14         THE COURT:  Yours was filed before.

15         MR. WINSBERG:  Correct.

16         THE COURT:  And you-all filed it.

17         MR. WINSBERG:  We filed our UCC on October 1.  We

18 were not aware that -- in our loan agreement, we have

19 provisions that prohibit additional indebtedness and liens on

20 our collateral, so the filing of the Bondit lien is a breach of

21 our agreement and this is where, Your Honor, we're just going

22 to have to at some point develop more facts.

23         But the reality is any rational lender would not

24 assert a first priority lien, pulling the lien searches, like

25 Bondit did, like they said in their UCC-1, without somebody

```
 1   providing Bondit a subordination agreement, purportedly having
 2   Bay Point subordinate its lien, which doesn't exist.
 3            THE COURT:  Okay.  I understand.  So Bondit, since
 4   you filed yours, Bondit, if they filed theirs, yours would have
 5   priority over it?
 6            MR. WINSBERG:  Correct.
 7            THE COURT:  And what you're suggesting by the Bondit
 8   item is that it indicates that Bondit must have been misled in
 9   the way that you-all were misled in regards to Columbia State
10   Bank?
11            MR. WINSBERG:  Correct, Your Honor.
12            THE COURT:  That's what you're saying?  Maybe that
13   happened, you don't know, but that's one possible explanation.
14   Or Bondit, for whatever reason, just took a secondary interest?
15            MR. WINSBERG:  The UCC-1 by Bondit says that they
16   claim the first priority interest, Your Honor.
17            THE COURT:  You're right, it does.
18            MR. WINSBERG:  And the UCCs are a matter of public
19   record.  I mean, your Honor could order searches, and you would
20   find it.  And in normal commercial loans -- and Mr. Rierson, we
21   would offer him up to testify, was going to address these
22   issues, about how these loans get closed, but it also likely
23   means to get a first priority lien, like they believed, they
24   probably had to have received a subordination agreement from
25   Columbia Bank, like we did as well, because their UCC-1 would
```

1  have also been on file.

2          THE COURT:  How many other subordinate agreements did

3  your client accept when they --

4          MR. WINSBERG:  There were a total, Your Honor, of I

5  believe seven.  And obviously, what we've learned between the

6  Bondit UCC-1 and the email we received last night from

7  Columbia Bank's counsel cast into doubt those subordination

8  agreements.  We don't know.

9          THE COURT:  So you have what you have with Columbia

10  with six others?

11          MR. WINSBERG:  Correct, Your Honor.

12          THE COURT:  And you have now heard from Columbia that

13  what you have is not authentic?

14          MR. WINSBERG:  Yes, Your Honor.

15          THE COURT:  And your concern is that the other six

16  are similarly inauthentic?

17          MR. WINSBERG:  That's the concern, yes, Your Honor.

18          THE COURT:  And as some more evidence of that, you

19  present to me the issue with Bondit, which might have had done

20  to them what was done to you?

21          MR. WINSBERG:  That's correct, Your Honor.

22          THE COURT:  I'm just trying to make sure that -- I

23  get what your point is.  I want to make sure that I understand

24  your point.  So if I'm missing your point, please make sure I

25  get it.  You know, you guys have spent a lot of time on this, a

1  lot more than I know, so I'm trying to make sure that I'm

2  keeping up with where you're going with it.

3       But I think if that's the point you're making, I get

4  that point.

5       And is there anything that you want to say about

6  that, Ms. Godfrey?

7       MS. GODFREY:  No, Your Honor.  I think we've covered

8  that topic.

9       THE COURT:  Okay.  If there comes a time when you

10  want to have some input, you just let me know.  Okay?

11       MS. GODFREY:  Thank you, Your Honor.

12       THE COURT:  Thank you.

13       All right.  Go ahead.

14       MR. WINSBERG:  On that point, Your Honor, we had

15  agreed with Ms. Godfrey, in light of the allegation, to

16  remove -- should the Court grant the receivership to remove the

17  first priority language, because we, frankly, just don't have

18  enough information to present to the Court for you to make that

19  specific finding.

20       THE COURT:  Okay.

21       MR. WINSBERG:  And finally, as of today, as Your

22  Honor might be --

23       THE COURT:  I would have thought SBA loans can't be

24  subordinated.  Can they be?

25       MR. COHAN:  Your Honor, I absolutely agree.

1          MR. WINSBERG:  Your Honor, I have seen an SBA

2    subordinated loan before, and usually those subordination

3    agreements look a certain way, and I just -- the subordinations

4    we got, it's just -- it's a shock to us to get the email last

5    night at 8:00 p.m.

6          THE COURT:  Okay.  I mean, maybe, I suppose you

7    could.  But aren't they government-backed loans?

8          MR. WINSBERG:  They are, Your Honor.

9          THE COURT:  Okay.  All right.  I'm sorry.  Keep

10   going.

11         MR. WINSBERG:  Your Honor, as Your Honor indicated

12   earlier, the defendants have failed to pay back one penny of

13   the loan, even though we've given them ample opportunity

14   through two different forbearance agreements to make a payment,

15   and even though they represented in their response brief, which

16   just goes to why we need a receiver, they represented on Page 3

17   that both companies are in operation since formation, both

18   entities have borrowed and repaid loans from multiple third

19   parties, and the companies are up and running, open for

20   business, and have an optimistic forecast for success as we all

21   emerge from the nearly year-long pandemic.

22         Your Honor, as the evidence is going to show, we

23   believe the Court should grant the appointment for a receiver,

24   and that we will show the Court that we meet all six elements

25   to appointment of a receiver, as we cited in the *IP Company v.*

1   *CellNet* case found at 2008 WL 11337999.

2           THE COURT:  That's the Judge Carnes' case?

3           MR. WINSBERG:  Yes, Your Honor, I believe that's the

4   case.

5           THE COURT:  Okay.

6           MR. WINSBERG:  And those six factors -- and they're

7   not all dispositive -- but the six factors to appoint a

8   receiver are:  One, that you have fraudulent activity, or that

9   you are likely to continue; that, two, the plaintiff has a

10  valid lien on the property of the proposed receivership; three,

11  there is imminent danger to the property that it will be lost

12  or diminished in value; four, the legal remedies are

13  inadequate; five, less severe equitable remedies are

14  unavailable; and six, it's more probable that the receivership

15  will do more good than harm.

16          Your Honor already has the verified complaint in

17  support of the receivership motion, and we provided the Court

18  with the exhibits, and opposing counsel yesterday.  The only

19  additional exhibit that was added this morning from yesterday

20  that was circulated is Exhibit V, which is the email we

21  received last night at 8:00 p.m.

22          As Your Honor noted, the defendants did file an

23  objection.  They did not attach any sort of evidentiary --

24  there's no declaration or affidavit in support of it.

25          And I'm happy to go through the arguments and address

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  the questions Your Honor has and address the defendant's

2  arguments, but since this really is an equitable remedy we're

3  asking Your Honor to do today, and it's really going to be

4  based on the record, I propose we just go ahead and put our

5  witness up and have Mr. Rierson testify and defer arguments to

6  after the Court hears the testimony.

7       THE COURT:  That would be fine if that's what you

8  want to do.  Can you just preview for me the reliance on the

9  misrepresentation in the document?  The three loans, do you

10 claim there was a misrepresentation about the Fight Club

11 Network and the Big Media?

12      MR. WINSBERG:  We certainly -- as to -- we don't know

13 why those other two agreements were altered.  We only know of

14 the one that was altered, so we don't know why the other two

15 agreements were altered at this point, but we do -- we do have

16 testimony that will come in in an exhibit that will show that

17 the defendants absolutely represented that those agreements

18 were going to pay very quickly after the loan.

19      THE COURT:  That's the email that I saw?

20      MR. WINSBERG:  Yes.

21      THE COURT:  From early September or late August,

22 something like that?

23      MR. WINSBERG:  There is an email in Exhibit O,

24 Your Honor.

25      THE COURT:  Okay.  All right.  Very well.  All right.

1   Well, then you can go ahead, and I'll wait to hear that.

2             MR. WINSBERG:  Thank you, Your Honor.

3             Ms. Peruach is going to be handling the direct

4   examination of the witness.

5             THE COURT:  Okay.

6             MS. PEURACH:  Your Honor, we would call Chandler

7   Rierson.

8             THE COURT:  Okay.  Isn't Hoplite an old soldier?  Is

9   that what it's named after?

10            MR. COHAN:  I asked that question, Your Honor, and my

11  understanding is that, yes, it's a Hoplite soldier, and that

12  the name is significant because you're only as good as the

13  soldier next to you.

14            THE COURT:  Got it.  Okay.  I just was curious about

15  that.  I wasn't sure if light was meant to be --

16            MR. COHAN:  I thought it was some kind of light in a

17  film.

18            THE COURT:  That's what I thought it maybe was too,

19  but I remember the big spears, I think.

20            All right.  Go ahead.  Hi.

21            THE WITNESS:  How are you, sir?

22            THE COURT:  I'm doing fine.  Thank you.

23            COURTROOM DEPUTY:  Can you raise your right hand.

24                         - - -

25            CHANDLER RIERSON,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1  A witness herein, having been first duly sworn, was examined
 2  and testified as follows:
 3                            - - -
 4        COURTROOM DEPUTY:  Thank you.  Please state and spell
 5  your full name for the record.
 6        THE WITNESS:  Chandler Rierson, C-H-A-N-D-L-E-R, last
 7  name Rierson, R-I-E-R-S-O-N.
 8        COURTROOM DEPUTY:  All right.  Thank you.
 9                    DIRECT EXAMINATION
10  BY MS. PEURACH:
11  Q.   Good afternoon, Mr. Rierson.
12        MS. PEURACH:  And, Your Honor, I hope you don't mind
13  me being at the podium.  It just seemed a little more natural
14  to be closer to him for this.
15        THE COURT:  That's fine.
16  BY MS. PEURACH:
17  Q.   Mr. Rierson, can you tell us where you work?
18  A.   Bay Point.
19  Q.   And what's your position with Bay Point?
20  A.   I am a CPA by trade, but I work on the loan origination
21  and loan underwriting side of the business.
22  Q.   And working on the loan origination and underwriting side
23  of the business, what are your responsibilities?
24  A.   So I originate, you know, opportunities that come into
25  our -- into our business to facilitate a loan.  As those
```

```
1   opportunities come in, I vet them, I do the underlying due

2   diligence, I go through the legal process with our attorneys to

3   make sure everything is documented correctly and we have all

4   the support we need to make -- make the loan or the financing

5   opportunity.

6   Q.   So do you weigh in on the ultimate decision of whether or

7   not to proceed with the loan?

8   A.   Absolutely.

9   Q.   And are you familiar with the defendants in this case,

10  Hoplite, Inc., Hoplite Entertainment and Jonathan Smith?

11  A.   I am.

12  Q.   And if I say -- refer to Hoplite as just Hoplite, will you

13  understand that I'm referring to both entities, Hoplite Inc.

14  and Hoplite Entertainment?

15  A.   Correct.

16  Q.   Okay.  Were you involved with the loan that Bay Point made

17  to those defendants?

18  A.   I was.

19  Q.   The loan that brings us here today?

20  A.   Correct.

21  Q.   What was your involvement with that loan?

22  A.   I was probably -- I mean, I was the lead underwriting on

23  the opportunity that came through one of our media contacts.

24  And I met Jon Smith personally on multiple occasions and went

25  through the due diligence process with him and his -- his
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  company.

2  Q.   When you say you were the lead underwriter, were you sort

3  of the point person for vetting the loan before deciding

4  whether or not to proceed with it?

5  A.   Yes.

6  Q.   And so you mentioned that the opportunity came your way

7  through a media contact.  Can you tell us a little bit more

8  about how the potential loan came to be an opportunity for

9  Bay Point?

10  A.   Yes.  There's a gentleman named Walter Josten that we know

11  through the media side of our business.  We've looked at

12  several film and production company financings that he's

13  brought to us.  He's been in business for, you know, 25 or 30

14  years.  He reached out to us, I believe, in mid-August with the

15  opportunity and that's how it came to our attention.

16  Q.   Okay.  And the opportunity you're referring to, is that

17  the potential loan to Hoplite?

18  A.   Yes, the $2 million for the three receivables/licensing

19  agreements that they had in place.

20  Q.   Okay.  So that's what -- my next question, which I'll have

21  you tell me a little bit more about what did Mr. Josten tell

22  you about, if anything, about the financing that Hoplite was

23  looking for at the time?

24  A.   Yeah, so he, you know -- you know, first he introduced us

25  to Jon, but he also, you know, provided us the contracts and

1 | the license agreements that they had in place that were already

2 | signed and executed and portrayed that those shows, they were

3 | productions that were being requested from those distributors

4 | have been finished and delivered that would, you know, kind of

5 | trigger a payment to -- to Hoplite within, you know, a 60- to

6 | 90-day period.

7 | Q.   Okay.  So -- just backing up, so when Mr. Josten first

8 | approached you about the loan, he told you about the license

9 | agreements that purportedly existed between Hoplite and other

10 | entities?

11 | A.   Yes, he did, and he outlined the amounts of those

12 | agreements.

13 | Q.   And that was about $3.4 million?

14 | A.   Yes, it was.

15 | Q.   Okay.  And did he represent to you that those payments

16 | were due in the near term?

17 | A.   Yes.

18 | Q.   And are those payments coming due in the near term why you

19 | were told Hoplite needed the loan.

20 | A.   Yeah.  I mean, it was essentially a short-term liquidity

21 | bridge to provide them working capital to continue to finance

22 | other productions that they had in process with the idea that

23 | those receivables would be paid in the next 60 to 90 days to

24 | pay us back.

25 | Q.   All right.  And I'd like you to turn -- you have a

1  notebook in front of you with some exhibits in it.  If you just

2  turn to Tab A, there is a document marked Plaintiff's Exhibit

3  A.  Do you see that?

4  A.   I do.

5  Q.   And your name is in the to line.  It appears to be an

6  email from Walter Josten to you and Rob Moran dated Tuesday,

7  October 25th, 2020.  Do you see that?

8  A.   Yes, ma'am.

9  Q.   The subject is loans opportunity?

10  A.   Yep.

11  Q.   Do you recognize this email?

12  A.   I do.

13  Q.   Do you recall receiving it?

14  A.   I did.

15  Q.   Is it a true and accurate copy of the email you received?

16  A.   It is.

17       MS. PEURACH:  Your Honor, can we please move to admit

18  Plaintiff's Exhibit A into evidence?

19          THE COURT:  Is there any objection to that?

20          MR. COHAN:  No objection, Your Honor.

21          THE COURT:  Okay.  It's admitted then.

22          MS. PEURACH:  Thank you, Your Honor.

23  BY MS. PEURACH:

24  Q.   So, Mr. Rierson, turning your attention to the email, it

25  starts on the first line:  Here's the deal I spoke with you

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1 about yesterday.  And it goes on to say:  Loan amount request

2 is one million U.S. dollars to two million U.S. dollars against

3 $3,438,000 in receivables.  Do you see that?

4 A.   I do.

5 Q.   And was that summary of the deal you spoke about yesterday

6 consistent with your recollection of your discussions with

7 Mr. Josten?

8 A.   Absolutely.

9 Q.   Okay.  The next line says:  The episodes have been

10 delivered.  Do you see that?

11         It's on the next line after --

12 A.   Oh, yes.

13 Q.   -- 3.438 in receivables?

14 A.   Correct.

15 Q.   What did you understand the significance of that to be,

16 that the episodes had been delivered?

17 A.   Yeah, so in those agreements, there's outlines of, you

18 know, when the productions are delivered to those distributors

19 for distribution, that's kind of the triggering mechanism that

20 triggers those -- those payments.

21 Q.   Okay.  And then if you skip down towards the bottom of the

22 email, there are three entries that start with Screen Media,

23 Crackle, Sony, it says $1.488 million, Fight Channel

24 $1 million, Big Medial/National Geographic $950,000, totaling

25 $3,438,000.  Do you see that?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  A.    I do.

2  Q.    And what did you understand Mr. Josten to be conveying to

3  you by laying out those three figures?

4  A.    That this was the amount that was owed to them in the, you

5  know, short to near term.

6  Q.    And when you say them, you're talking about Hoplite?

7  A.    Yes, correct.

8  Q.    Okay.  All right.  So after your initial discussions with

9  Mr. Josten, was Bay Point interested in making the loan to

10 Hoplite?

11 A.    Yeah, on the surface, obviously, you know, there's enough

12 collateral to support our $2 million loan, so, you know, we

13 started the due diligence process.  We issued a term sheet and

14 went through our kind of normal practices and procedures to

15 issue the loan.

16 Q.    And in that process, did Bay Point ask Hoplite for proof

17 of the account receivables that had been represented by

18 Mr. Josten?

19 A.    Yes.

20 Q.    And did Hoplite provide evidence of those receivables to

21 Bay Point?

22 A.    Yes.

23 Q.    And what did Hoplite provide as evidence of its accounts

24 receivable?

25 A.    Yeah, the same licenses agreements that -- that Walter had

1  provided.

2  Q.   Okay.  So if you could turn to Exhibit B, this appears to

3  be a license agreement.

4        THE COURT:  I'm sorry, I didn't mean to interrupt

5  you.  Did you say that he actually sent you those documents as

6  well?

7        THE WITNESS:  I would say he confirmed that

8  they're -- those are the ones that, you know, were shown to

9  him.

10        THE COURT:  He said I've looked at them?

11        THE WITNESS:  Yes.

12        THE COURT:  But he didn't necessarily give them to

13  you?

14        THE WITNESS:  No.

15        THE COURT:  You got them in what you're telling me

16  now?

17        THE WITNESS:  Through Walter, correct, yes, sir.

18        THE COURT:  Okay.  Thank you.  Through Walter?

19        THE WITNESS:  Yeah.

20        THE COURT:  Oh, okay.  All right.  Okay. I thought a

21  minute ago he did not give them to you, he just told you about

22  them.

23        THE WITNESS:  He told us about them, then he

24  subsequently provided them via email.

25        THE COURT:  Okay.  And then at some point you're

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1   talking to -- Walter is the guy at Blue --
 2            THE WITNESS:  Blue Rider.
 3            THE COURT:  Okay.  At some time, you're talking to
 4   the people actually at Hoplite?
 5            THE WITNESS:  Oh, absolutely, yeah.
 6            THE COURT:  All right.  Sorry.
 7            I didn't mean to cut you off.  I just want to make
 8   sure I'm following.
 9            MS. PEURACH:  No worries.  Please, at any point.
10   BY MS. PEURACH:
11   Q.   Looking at Exhibit B, is this the license between
12   Big Media Holdings and Hoplite that Bay Point was provided as
13   evidence as Hoplite's account receivable with Big Media?
14   A.   It is.
15   Q.   Okay.  And is this a true and accurate copy of that
16   agreement as was provided to you?
17   A.   Yes, it is.
18            MS. PEURACH:  Your Honor, I'd like to move
19   Plaintiff's Exhibit B into evidence.
20            MR. COHAN:  No objection.
21            THE COURT:  Then it is admitted.
22            Who provided this to you?
23            THE WITNESS:  It came through Walter.
24            THE COURT:  Okay.  Got it.  All right.  Go ahead.
25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1 | BY MS. PEURACH:

2 | Q.   Mr. Rierson, if you could turn to Exhibit C, this is a

3 | license agreement between Screen Media Ventures and

4 | Hoplite Entertainment.  Do you see that?

5 | A.   I do.

6 | Q.   And it says it's made effective as of July 1st, 2020.  Do

7 | you recall receiving this document?

8 | A.   I do.

9 | Q.   And is this the license agreement that Mr. Josten provided

10 | to you on behalf of Hoplite as evidence of Hoplite's

11 | accountants receivable?

12 | A.   It is.

13 | Q.   Is this a true and accurate copy of that version of the

14 | license agreement as it was provided to you?

15 | A.   Yes, it is.

16 |        MS. PEURACH:  Your Honor, I'd like to move

17 | Plaintiff's Exhibit C into evidence.

18 |        MR. COHAN:  No objection.

19 |        THE COURT:  It's admitted.

20 | BY MS. PEURACH:

21 | Q.   And then the third one, you mentioned a third licensing

22 | agreement, so I'd like you to turn to Exhibit D.  This appears

23 | to be an agreement with Fight Channel.  Do you see that?

24 | A.   Yes.

25 | Q.   And is this a true and accurate copy of the Fight Channel

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  agreement that was provided to you by Mr. Josten on behalf of

2  Hoplite as evidence of Hoplite's account receivable?

3  A.   It is.

4        MS. PEURACH:  Your Honor, I'd like to move

5  Plaintiff's Exhibit D into evidence.

6        MR. COHAN:  No objection.

7        THE COURT:  It is then.  Thank you.

8  BY MS. PEURACH:

9  Q.   All right.  So, Mr. Rierson, when you received these three

10  agreements, did you review them?

11  A.   Yes, I did.

12  Q.   And did you have any reactions to Exhibits B through D

13  that we just looked at?

14  A.   No.  They appeared to be legitimate and actual

15  distribution agreements.

16  Q.   And did you rely on these agreements in deciding to move

17  forward with the loan with Bay Point?

18  A.   Absolutely.

19  Q.   Now, during the due diligence process, did you discuss the

20  substance of these agreements and their terms with Mr. Smith?

21  A.   Yes.

22  Q.   And what did Mr. Smith tell you about these license

23  agreements?

24  A.   Just --

25        MR. COHAN:  Objection, hearsay.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          MS. PEURACH:  Your Honor is entitled to hear hearsay

2     at this preliminary hearing, as defense counsel has

3     acknowledged in its brief.

4          MR. COHAN:  Your Honor, these are out-of-court

5     statements that they're using to prove the proof of the matter

6     asserted.

7          THE COURT:  But isn't he a party opponent?

8          MS. PEURACH:  Yes.

9          MR. COHAN:  He is a party opponent.

10         THE COURT:  I'm going to overrule the objection and

11    allow it for both reasons.  I think I can hear it today.

12    There's no jury here.  I can assess whether it's credible or

13    not, but more importantly, it is a party opponent, and I think

14    all of us, everyone has known it was going to be a part of

15    their presentation today.  Okay.

16         THE WITNESS:  Can you repeat the question?

17    BY MS. PEURACH:

18    Q.   No problem.  So just if you could tell us what Mr. Smith

19    told you about these license agreements as you were negotiating

20    and deciding whether to proceed with the loan.

21    A.   Yeah.  So, you know, we kind of went through, you know,

22    his agreement that he had at Fight Channel to finance not only

23    this -- this project but other projects he'd done in the past,

24    and that there was other content that he had in his library

25    that he was, you know, providing to Screen Media and Big Media

EXHIBIT K
PAGE 345

1    that would generate those receivables.

2    Q.    So just to drill down a little bit more -- and let's start

3    with Exhibit D, which is in front of you right now --

4    A.    Yeah.

5    Q.    -- the acquisition agreement with Fight Channel.  Did he

6    tell you -- strike that.

7          Did Mr. Smith tell you about the amount of Hoplite's

8    alleged receivable from Fight Channel pursuant to this

9    agreement?

10   A.    He did.

11   Q.    What did he tell you?

12   A.    One million dollars.

13   Q.    And did he tell you anything about the timing that that

14   payment was due to Hoplite?

15   A.    Yes, he outlined that I believe the show was going to be

16   delivered in the next 30 days, and then that would trigger the

17   payment per the agreement.

18   Q.    And then looking back at Exhibit --

19          THE COURT:  And that would trigger what, the payment

20   to your company?

21          THE WITNESS:  Correct.  Yeah.

22          THE COURT:  Okay.

23          THE WITNESS:  So if you look, I think the payment is

24   triggered upon delivery.

25          THE COURT:  Is that where were you going next?

1          MS. PEURACH:  Yes, but that's okay.

2          THE COURT:  Okay.  Go ahead.  Lead on.

3          MS. PEURACH:  All right.

4  BY MS. PEURACH:

5  Q.   And then we'll go to Exhibit C.

6  A.   Okay.

7  Q.   Which is the license agreement with Screen Media Ventures.

8  And if I could direct your attention to Section 2C, it says in

9  advance of $12,000 per episode shall be paid in full within 45

10  days of full delivery?

11  A.   Correct.

12  Q.   Do you see that?

13          And then it says:  This advance has been calculated

14  against programs total as shown on Exhibit A.  Do you see that?

15  A.   Yep.

16  Q.   And if you look at Exhibit A, the total is $1.488 million,

17  right?

18  A.   Correct.

19  Q.   Did you discuss those payment terms with Mr. Smith as

20  reflected in Exhibit C?

21  A.   Yes.  Yes.

22  Q.   And what did those discussions entail?

23  A.   That those were prior shows that had already been

24  completed, and those were already delivered and those payments

25  would be forthcoming.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    Q.    And would they be forthcoming within 45 days of that

2    delivery?

3    A.    Correct.

4    Q.    And then turning back to Exhibit B, the license agreement

5    with Big Media, did you and --

6            Let me first turn your attention in Exhibit B to

7    Section 12.  And it says:  License fee $950,000.  Do you see

8    that?

9    A.    I do.

10   Q.    And then the next Section 13 says:  Payment terms,

11   50 percent $475,000 within 90 days of mutual execution.

12   A.    Yeah.

13   Q.    And then 50 percent, $475,000 within 90 days of license

14   start date.  Do you see that?

15   A.    Yep.

16   Q.    Did you discuss these payment terms reflected in Exhibit B

17   with Mr. Smith?

18   A.    Yes.  I did.

19   Q.    And what did those discussions entail?

20   A.    He portrayed that the first 50 percent had been pushed and

21   deferred to make one lump sum of $950,000, and then that would

22   be paid upon delivery and technical acceptance.

23            THE COURT:  Say that again.  I didn't catch that.

24   Say that again.

25            THE WITNESS:  Yeah.  So the first 50 percent that was

1  supposed to be paid within 45 days, or 90 days of the

2  agreement, that would probably put it -- I think this was

3  signed in June, that they had agreed to allow one lump sum

4  payment of $950,000 upon technical acceptance.

5  BY MS. PEURACH:

6  Q.    And technical acceptance is the start date?

7  A.    Yeah.  So essentially they'll provide the shows, they go

8  through a technical period where they review the content and

9  the technical aspects of the shows.

10 Q.    And what representations, if any, did Mr. Smith make to

11 you about the start date?

12 A.    I think he outlined it in email when the payments -- but

13 he had portrayed that those had already been delivered and they

14 were going through their technical acceptance period.

15 Q.    Okay.  Well, you read my mind, so I'm going to direct your

16 attention to Exhibit O, which I think is the email you're

17 referring to.

18 Q.    And actually, before I dive into this, let me ask you this

19 question:  After you discussed the three agreements with

20 Mr. Smith, did he represent to you that Hoplite intended to use

21 those funds to repay its loan to Bay Point?

22 A.    Absolutely.  We even put a direction to pay notice to --

23 in place for each of the distributors that they signed and

24 agreed to pay those fees directly to us versus directly to

25 Hoplite.

EXHIBIT K
PAGE 349

1  Q.   And is that why the loan agreement required the

2  establishment of the collateral proceeds account?

3  A.   Exactly.

4  Q.   The specified collateral proceeds account, I should say?

5  A.   Yes.  Correct.

6  Q.   Okay.  Looking at Exhibit O, it appears to be an email

7  from Jon Smith to you copying Mr. Musina and Mr. Jonsten dated

8  September 28, 2020; is that right?

9  A.   Correct.

10  Q.   And that's two days before the loan closed?

11  A.   Yes.

12  Q.   All right.  And do you recognize this email?

13  A.   I do.

14  Q.   It also appears, if you look at the second -- the lower

15  half of the email to be an email from you that's being

16  responded to?

17  A.   Correct.

18  Q.   Is this a true and accurate copy of that exchange?

19  A.   It is.

20        MS. PEURACH:  Your Honor, I'd like to move

21  Plaintiff's Exhibit O into evidence.

22        MR. COHAN:  Your Honor, I have the same objection

23  about just that we didn't have any notice of it until yesterday

24  afternoon.  Other than that, no objection.

25        THE COURT:  Okay.  The objection is overruled.

1  BY MS. PEURACH:

2  Q.   So, Mr. Rierson, I'd like to direct your attention to the

3  first in time email starting in the middle of the page on

4  Exhibit O, and actually the last line.

5  A.   Yeah.

6  Q.   Which says:  I am trying to outline the expected payment

7  period for each agreement.  Do you see that?

8  A.   Correct.  Yes.

9  Q.   All right.  So now let's look up at Mr. Smith's email on

10 the top.  And he says to you:  Hey, Chandler, see responses

11 below.  Do you see that?

12 A.   I do.

13 Q.   So did you take it that Mr. Smith was responding to

14 questions you had posed to him in your below email?

15 A.   Yes.

16 Q.   All right.  Let's look down at those questions.

17        The first line of your email to Mr. Smith says:  Has

18 50 percent of the Big Media license fee been received already

19 per the agreement?  It says 90 days after execution.

20        Did you write that question to Mr. Smith?

21 A.   I did.

22 Q.   The next sentence says:  They are set to pay this on

23 October 15th.

24        Was that Mr. Smith's response to you?

25 A.   Yes, it was.

1  Q.   The next line says:  When is Therapy Dogs expected to be

2  delivered to Fight Channel?

3        Did you write that question to Mr. Smith?

4  A.   I did, yes.

5  Q.   And then the response is:  We are delivering this in the

6  next two weeks and are expecting payment by the 15th of

7  November.  Typically they pay within about 10 to 20 biz days of

8  delivery.

9        Was that Mr. Smith's response to your question?

10 A.   Yes.

11 Q.   Finally, the last line says:  When are the episodes

12 outlined in the agreement expected to be delivered to

13 Screen Media?

14       Was that your question to Mr. Smith?

15 A.   It is.

16 Q.   Already delivered.  They are set to pay on the 30th of

17 October.

18       Was that Mr. Smith's response to you?

19 A.   It was.

20 Q.   Did you rely on Mr. Smith's statements to you two days

21 before making the loan in deciding to proceed with the loan?

22 A.   Absolutely.

23 Q.   And why were you asking Mr. Smith these questions --

24 A.   Just so we have a timeline.

25 Q.   -- two days before you decided to proceed with the loan?

1  A.    Say again.

2  Q.    Why were you asking Mr. Smith these questions two days

3  before you decided to proceed with the loan?

4  A.    Just to have an outline that those shows had been

5  delivered and confirm that -- you know, kind of a timeline,

6  establish a timeline for those payments.

7  Q.    Now, Bay Point's due diligence must have entailed more

8  than just looking at the license agreement; is that fair?

9  A.    Correct.

10 Q.    Did Bay Point look into whether or not Hoplite had any

11 other outstanding indebtedness at the time it was agreeing to

12 loan $2 million to Hoplite?

13 A.    Absolutely.  We ran a UCC search.

14 Q.    And what did you discover?

15 A.    We discovered that SPA Columbia loan and a handful of

16 other outstanding creditors.

17 Q.    And did Bay Point take any steps to address those

18 outstanding loans that were in existence prior to entering the

19 loan agreement?

20 A.    Yes, we coordinated with Jon on getting subordination

21 agreements for each of those creditors.

22 Q.    Did you require those subordination agreements to proceed

23 with the loan to Hoplite?

24 A.    Yes.

25 Q.    And did Mr. Smith provide Bay Point with each of those

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  subordination agreements?

2  A.    He did.

3  Q.    And that includes the subordination agreement from the SBA

4  loan, right?

5  A.    Yes.

6         THE COURT:  How much is the SBA loan?

7         THE WITNESS:  I believe it's around 1.5 million.

8         MR. WINSBERG:  I think Ms. Godfrey's going to have to

9  answer that, because there's an allegation that what was

10 provided, the loan documentation was inaccurate, so I think she

11 would have to address it.

12        MS. GODFREY:  Your Honor, if I may.

13        THE COURT:  Yes, please.

14        MS. GODFREY:  We've got two loans, one for $905,000

15 and one for $750,000.

16        THE COURT:  So what did you think it was?

17        THE WITNESS:  1.5 that was --

18        THE COURT:  1.5?

19        THE WITNESS:  Looks like it was 1.6, so close.

20        THE COURT:  1.655 maybe?

21        THE WITNESS:  Yes.

22        THE COURT:  Go ahead.

23        MS. PEURACH:  Okay.

24        THE COURT:  You remember that amount 1.5, you can say

25 that that's what you --

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1              THE WITNESS:  That was just my recollection.

 2              THE COURT:  Do you think it's different from what you

 3  just heard?

 4              THE WITNESS:  That sounds about right.

 5              THE COURT:  Oh, you think it could be what you heard?

 6              THE WITNESS:  No.  Yeah.  Yeah, that sounds right.

 7              THE COURT:  Okay.  Fair enough.

 8              THE WITNESS:  I was just referring to it off of

 9  recollection.

10              THE COURT:  Okay.  Good enough.  Thank you.

11              THE WITNESS:  Yes.

12  BY MS. PEURACH:

13  Q.   So just to be clear, so was Mr. Smith the one who provided

14  the subordination agreements to Hoplite as a condition of

15  entering the loan?

16  A.   Say that one more time.

17  Q.   Sure.  Was Mr. Smith the one who provided you the

18  subordination -- the subordination agreements?

19  A.   Yes.

20  Q.   Okay.  Were you surprised at all that the creditors agreed

21  to subordinate their debt?

22  A.   No.  Given the short-term nature of the loan and that we

23  had specific collateral to pay us back, it was not unreasonable

24  that they would subordinate their position.

25  Q.   So after the due diligence period and your review of the
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  information provided to you by Hoplite, did Bay Point

2  ultimately loan Hoplite the $2 million?

3  A.    We did.

4  Q.    And that was pursuant to the terms of a loan and security

5  agreement; is that right?

6  A.    It was.

7  Q.    Okay.  So let's take a look in your binder at Exhibit E.

8  It appears to be -- it's titled loan and security agreement

9  entered as of September 30th, 2020, by Hoplite Entertainment

10  Inc. and Hoplite on the one hand and Bay Point Capital Partners

11  on the other.

12         Do you see that?

13  A.    I do.

14  Q.    And is this a true and accurate copy of the loan agreement

15  between Hoplite and Bay Point?

16  A.    It is.

17         MS. PEURACH:  Your Honor, I would like to move

18  Plaintiff's Exhibit E into evidence.

19         MR. COHAN:  No objection.

20         THE COURT:  Okay.  It's admitted.

21  BY MS. PEURACH:

22  Q.    All right.  So the loan agreement's dated September 30th,

23  2020.

24         What was the term of the loan to Hoplite?

25  A.    Three months.

1   Q.   And so was the maturity date at the end of 2020?

2   A.   It was.

3   Q.   All right.  And did the loan -- did the terms of the loan

4   agreement require Hoplite to make interest payments to

5   Bay Point?

6   A.   Yes, monthly, in arrears.

7   Q.   So Hoplite had to make monthly interest payments to

8   Bay Point?

9   A.   Correct.

10  Q.   Plus anything that was in arrears?

11  A.   Correct.

12  Q.   With a maturity date at the end of December 2020?

13  A.   Right.

14  Q.   And pursuant to the loan agreement, would Hoplite be in

15  default if it missed a payment to Bay Point?

16  A.   It would be.

17  Q.   Now, did Bay Point require Hoplite to put up collateral in

18  connection with entering the loan agreement?

19  A.   We did.

20  Q.   And so let's look at Section 4.1.  It is on Page 17.

21       And do you understand Section 4.1 to set out the

22  security interest and collateral that Hoplite was agreeing to

23  provide Bay Point consideration for the loan?

24  A.   I did.

25  Q.   And you'll see in the first sentence, per the loan

1  agreement, it purports to provide Bay Point with a continuing

2  lien on and security interest in all of such borrower's right,

3  title and interest in and to all of the following presently and

4  existing -- presently existing and hereafter acquired or

5  arising property wherever located to find the collateral.

6          And it goes on to specify a variety of property,

7  including the specified collateral; is that right?

8  A.    Correct.

9  Q.    And you understood this section to define the collateral

10  in which Bay Point was purportedly receiving a first priority

11  security interest?

12  A.    I do.

13  Q.    All right.  And, in fact, at the end of that sentence,

14  it's about two-thirds of the way down, it says:  Such security

15  interest constitutes a valid first priority security interest

16  in the presently existing collateral and will constitute a

17  valid first priority security interest in collateral acquired

18  after the date hereof subject in each case to permitted liens.

19          Do you see that?

20  A.    Correct, yes.

21  Q.    All right.  Now, as we've just mentioned, this Section 4.1

22  included the specified collateral among the collateral that

23  Bay Point was given a first priority security interest in.

24          Is the specified collateral those three license

25  agreements that we've discussed?

EXHIBIT K
PAGE 358

1  A.   Correct, and all other business assets.

2  Q.   So the specified collateral was the three license

3  agreements?

4  A.   Yes, correct.

5  Q.   And the remaining collateral was a blanket?

6  A.   Correct.

7          THE COURT:  I think it's actually the accounts

8  receivable from those licensing agreements?

9          THE WITNESS:  Correct.

10          THE COURT:  Okay.

11          MS. PEURACH:  Yeah.

12          THE COURT:  All right.

13  BY MS. PEURACH:

14  Q.   So did Bay Point take steps to perfect its security

15  interest in the collateral?

16  A.   We did.  We filed a UCC-1.

17  Q.   All right.  And can I turn your attention to Exhibit P.

18          Do you recognize this document?

19  A.   I do.

20  Q.   And what is it?

21  A.   It's a UCC-1 filing.

22  Q.   And is this the UCC-1 that Bay Point filed against Hoplite

23  and Hoplite Entertainment to reflect its lien on all assets?

24  A.   It is.

25  Q.   And is this a true and accurate copy of that UCC-1

1  financing statement?

2  A.    Yes.

3        MS. PEURACH:  Your Honor, I move to admit Plaintiff's

4  Exhibit P into evidence.

5        MR. COHAN:  Your Honor, this is inadmissible hearsay.

6  It's not properly authenticated.  Mr. Rierson can't

7  authenticate it.  It's not a certified copy.

8        MS. PEURACH:  Your Honor, for the same reason as your

9  prior ruling on your ability to consider hearsay evidence at

10  the preliminary stage, I would remark that this document, while

11  it potentially could be considered hearsay, we don't need to go

12  down that avenue right now.

13        However, if we were to proceed, I'm not offering it

14  for the truth of the matter asserted, that we have the lien,

15  first priority, on all assets, because we've acknowledged that

16  there is actually a dispute as to that today, but to reflect

17  that a UCC-1 was filed.

18        THE COURT:  Okay.  I'm going to overrule the

19  objection.

20        Go ahead.

21  BY MS. PEURACH:

22  Q.    Mr. Rierson, could you turn you to Exhibit F.

23        Is this the note that Hoplite signed evidencing the

24  loan from Bay Point?

25  A.    It is.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1   Q.   And is it a true and accurate copy of that note?

2   A.   Yes.

3        MS. PEURACH:  Your Honor, I'd move to admit Exhibit F

4   into evidence.

5        MR. COHAN:  No objection.

6        THE COURT:  It is admitted.  Thank you.

7   BY MS. PEURACH:

8   Q.   Now, was Mr. Smith a party to the loan agreement?

9   A.   He was.

10  Q.   Let me put it differently.

11       So the loan agreement was between Hoplite and

12  Hoplite Entertainment, right?

13  A.   Correct, yes.

14  Q.   So did Mr. Smith guarantee those obligations?

15  A.   He did.  He did personally guarantee the obligation to

16  Bay Point.

17  Q.   All right.  And was that pursuant to a guarantee

18  agreement?

19  A.   It was.

20  Q.   All right.  If you could turn your attention to Exhibit G.

21       Is this the guarantee agreement that Mr. Smith

22  entered with Bay Point to personally guarantee the obligations

23  of Hoplite and Hoplite Entertainment pursuant to the loan

24  agreement?

25  A.   Yes, it is.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  Q.   Is it a true and accurate copy of that guarantee

2  agreement?

3  A.   It is.

4        MS. PEURACH:  All right.  Your Honor, I would like to

5  move Plaintiff's Exhibit G into evidence.

6        MR. COHAN:  No objection.

7        THE COURT:  It is admitted.

8        Looking back on the other document, the UCC filing, I

9  think it's a record of a document that effects an interest in

10 property, and I think it is therefore an exception to hearsay.

11       I wanted to take a minute to see if that was the best

12 one.  I don't really think the rules of evidence are at play

13 here, there's nothing to suggest that it is in any way

14 fabricated, although that is something that hangs over some of

15 this, but I'm going to -- I believe it is admissible under

16 that, and it's probably admissible under sort of the catch-all,

17 because there's no reason to think that this is in any way a

18 false document.  After all, the plaintiff got it from a

19 publicly available source; is that right?

20       MS. PEURACH:  Yes.  This is from the Secretary of

21 State.

22       THE COURT:  And it happens to be that when you found

23 it, you found the other one from the other company, so I think

24 there's no reason to suggest that it's in any way

25 untrustworthy, and it's consistent with what the witness has

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  said.

2          So go ahead.

3          MS. PEURACH:  Thank you, Your Honor.

4  BY MS. PEURACH:

5  Q.   Mr. Rierson, turning to Section 1 of the guarantee, that's

6  Exhibit G, did the guarantor unconditionally and irrevocably

7  guarantee to lender the punctual payment and performance of all

8  of the obligations of borrowers to lenders -- to lender arising

9  under or in connection with the loan agreement and the other

10 loan documents?

11 A.   Correct, yes.

12 Q.   So did you understand that to mean -- to mean that

13 Mr. Smith had personally guaranteed Hoplite's obligations under

14 the loan agreement?

15 A.   Absolutely.

16 Q.   Do you recall when Hoplite's first interest payment was

17 due to Bay Point under the loan agreement?

18 A.   I believe it was October 31st.

19 Q.   Did Hoplite make that payment to Bay Point?

20 A.   They did -- they did not.

21 Q.   Did Mr. Smith, the personal guarantor, make that payment

22 to Bay Point?

23 A.   He did not.

24 Q.   Do you recall when Hoplite's second interest payment was

25 due to Bay Point under the loan agreement?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  A.    November 30th.

2  Q.    Did Hoplite make the second interest payment to Bay Point?

3  A.    They did not.

4  Q.    Did Mr. Smith, the guarantor, make that second payment to

5  Bay Point?

6  A.    He did not.

7  Q.    And so as of the end of November of 2020, was Hoplite in

8  default under the terms of the loan agreement?

9  A.    Yes, they were.

10  Q.    And was Mr. Smith in default under the guarantee?

11  A.    He was.

12  Q.    And did Hoplite and Mr. Smith acknowledge that they were

13  in default?

14  A.    Yes.

15  Q.    And so what happened next?

16  A.    Yeah.  We engaged in conversations of a forbearance

17  agreement.  You know, he indicated that he was chasing payments

18  from the three distributors to -- you know, to get that money

19  into the door to pay us back.  He also indicated that he

20  couldn't make an interest payment to us, and that's kind of

21  what stemmed the conversations of the forbearance.

22  Q.    So did Mr. Smith ask Bay Point to forbear from exercising

23  its rights under the loan documents so that he could have some

24  extra time to collect from the accounts receivable on the three

25  license agreements?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  A.   Correct.

2  Q.   And did Bay Point ultimately agree to enter a forbearance

3  agreement with defendants?

4  A.   We did.

5  Q.   If I could --

6        THE COURT:  What kind of things did he say to you?

7  Because he had previously said some of the money was in the

8  door.

9        THE WITNESS:  Yeah.  I mean, he just said that, you

10 know, given the times, the distributors aren't paying on time,

11 and it's going to be pushed 30 to 60 days, and he was chasing

12 them down.  And he had other receivables that was coming in

13 that he could, you know, leverage to pay us back and other

14 capital sources coming, so there was a lot of various sources

15 that he said -- he kept promising was coming to pay us back.

16        THE COURT:  Okay.  Thank you.

17        THE WITNESS:  Yeah.

18 BY MS. PEURACH:

19 Q.   So turning to Exhibit H, Mr. Rierson, the document has a

20 title forbearance agreement, and it's dated December 4th, 2020,

21 between Bay Point, Hoplite Entertainment, Hoplite and Jonathan

22 Smith; is that right?

23 A.   Yes.

24 Q.   And is this the forbearance agreement you were just

25 referring to?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1 | A.   Yes, it is.

2 | Q.   Is it a true and accurate copy of the forbearance

3 | agreement entered between Bay Point and defendants in this

4 | case?

5 | A.   Yes.

6 | Q.   The first forbearance agreement, I should say.

7 | A.   Correct.

8 |          MS. PEURACH:  Your Honor, may I move to -- or I

9 | move -- may I please have you admit Plaintiff's Exhibit H into

10 | evidence?

11 |          MR. COHAN:  No objection.

12 |          THE COURT:  Then it is admitted.  Thank you.

13 | BY MS. PEURACH:

14 | Q.   And so, Mr. Rierson, if you could look to Recital D on the

15 | first page of Exhibit H, it says:  Borrowers are in default of

16 | the loan documents by failing to pay interest payments due on

17 | October 31st, 2020 and November 30th, 2020; is that right?

18 | A.   Correct.

19 | Q.   And the defendants entered this document, right?

20 | A.   Correct.

21 | Q.   If you turn to the next page of Exhibit H, Recital H lists

22 | amounts outstanding under the loan documents.

23 |          And it lists the total due as $2,235,238.89; is that

24 | right?

25 | A.   That is correct.

1  Q.   Okay.  And was that the amount outstanding from defendants

2  to Bay Point as of the date of the first forbearance agreement?

3  A.   Yes, it was.

4  Q.   Now, did the first forbearance agreement set out a payment

5  schedule for the defendants to follow to repay the outstanding

6  indebtedness to Bay Point?

7  A.   Yes.  And I think it's outlined in Exhibit E and F.

8  Q.   Yeah.  So I'll turn your attention, that's right, to

9  Sections 2E and 2F of Exhibit H.  That's the payment schedule

10  you're referring to?

11  A.   Correct.

12  Q.   Now, is this the payment schedule that Bay Point and

13  Hoplite initially agreed to?

14  A.   No, it is not.

15  Q.   How did it come to be that there are two payments in two

16  different sections both due on the same date?

17  A.   So when we sent him this forbearance agreement, I believe

18  it was on the 4th, it was our understanding, and Jon Smith

19  agreed to make that $200,000 payment on that day, December 4th.

20       When we received the forbearance agreement back

21  signed by the borrower and the guarantor, he had changed that

22  date to the 11th.

23  Q.   Did he notify you to the change that he had made in the

24  document --

25  A.   He did not.

1    Q.    -- when he sent it back to you?

2    A.    He did not.  We had to discover it on our own.

3    Q.    Did any of the defendants make the required payments set

4    forth in the first forbearance agreement?

5    A.    They did not.

6    Q.    All right.  And was failure to make those required

7    payments an event of default under the first forbearance

8    agreement?

9    A.    Yes, it was.

10   Q.    And so what happened next?  Did the defendants ask

11   Bay Point to forbear again?

12   A.    They did.

13   Q.    And what was the reason this time?

14   A.    Same type story.  You know, have this capital source

15   coming in.  I'm chasing these receivables.  I have money coming

16   in the door to pay you back, and kind of a promise to make --

17   to make a payment.

18   Q.    And so did Bay Point ultimately agree to enter a second

19   forbearance agreement?

20   A.    We did.

21   Q.    I'd like to turn your attention to Exhibit I.

22         And this document is titled second forbearance

23   agreement dated December 21st, 2020 between Bay Point and

24   Hoplite Entertainment, Hoplite Inc. and Jonathan Smith.

25         Do you see that?

```
1   A.   I do.

2   Q.   All right.  And is this a true and accurate copy of the

3   forbearance agreement entered into between the parties, the

4   second forbearance agreement?

5   A.   It is.

6           MS. PEURACH:  All right.  Your Honor, I'd like to

7   move to admit Plaintiff's Exhibit I into evidence.

8           MR. COHAN:  No objection.

9           THE COURT:  It is admitted.

10  BY MS. PEURACH:

11  Q.   All right.  I'd like to direct your attention,

12  Mr. Rierson, to Recital E.  It states:  Borrowers are in

13  default of the loan documents by, among other things, failing

14  to pay interest payments due on October 31st, 2020 and

15  November 30th, 2020, and failing to pay the outstanding amounts

16  due on the maturity date of December 11th, 2020.

17          Do you see that?

18  A.   I do.

19  Q.   And the defendants entered into this forbearance agreement

20  with Bay Point, right?

21  A.   Correct.

22  Q.   I'd like to direct your attention to Recital I on the next

23  page, the second page of Exhibit I, which says:  Amounts

24  outstanding under the loan documents, total due $2,517,618.89.

25          Do you see that?
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
1  A.   I do.

2  Q.   And did you understand that to be the amount due by

3  defendants to Bay Point as of the date of the second

4  forbearance agreement?

5  A.   Yes.

6  Q.   All right.  Now, did this second forbearance agreement

7  also set forth a schedule of repayment for defendants to adhere

8  to repay their indebtedness?

9  A.   It did.

10 Q.   And is that in Section 3 of Exhibit I?

11 A.   It is.

12 Q.   All right.  And did the payment terms reflected in

13 Section 3 of Exhibit I, do those terms reflect what the parties

14 originally agreed to when you were entering the forbearance --

15 the second forbearance agreement?

16 A.   No, they do not.

17 Q.   How do the terms reflected in Section 3 differ from those

18 that were originally agreed to by the parties?

19 A.   Similarly, he changed the date on the payment that that

20 first payment was due.

21 Q.   Pardon me?

22 A.   He changed the date on the first -- the first payment that

23 was due.

24 Q.   So the December 23rd payment?

25 A.   Correct.
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  Q.   And Mr. Smith is who you are referring to?

2  A.   Yes, ma'am.

3  Q.   And when he changed that date, did he call to your

4  attention the fact that he had changed the date in the document

5  when he returned it signed to you?

6  A.   He did not.

7            THE COURT:  Did you ever have someone do that to you

8  before?

9            THE WITNESS:  No.

10           THE COURT:  Okay.

11           THE WITNESS:  It doesn't happen very often.

12           THE COURT:  I wouldn't think so.

13  BY MS. PEURACH:

14  Q.   Now, did any of the defendants make any of the payments

15  set forth in Section 3 of Exhibit I?

16  A.   No.

17  Q.   And as a result of the failure to make those payments, are

18  defendants in default of the second forbearance agreement?

19  A.   They are.

20  Q.   And so sitting here today, have the defendants repaid any

21  of the outstanding indebtedness to Bay Point?

22  A.   They have not.

23  Q.   Now, before we move on from the second forbearance

24  agreement, I'd like to direct your attention back to the first

25  page, Recital G.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1            This states:  In addition to the above-referenced

2    monetary defaults, borrowers are in default of their

3    obligations under Sections 6.7, 8.2 and 8.8 of the loan

4    agreement.

5            Do you see that?

6    A.    I do.

7    Q.    Do you recall that provision?

8    A.    I do.

9    Q.    Do you recall why that provision was included in the

10    second forbearance agreement?

11    A.    Yes.  I believe it was due to misrepresentations and not

12    providing financial information.

13    Q.    All right.  Well, let's -- let's take a look.

14            So the first reference is to Section 6.7 of the loan

15    agreement, which is Exhibit E.  Let's turn back to that.  6.7

16    is on Page 23.

17            Just let me know when you get there.  Are you there?

18    A.    Yep.  I'm here.

19    Q.    Okay.  Great.  This says:  Maintenance of perfected

20    security interest further documentation.  All right?

21    A.    Yep.

22    Q.    And the first sentence says:  Each borrower shall take all

23    such actions reasonably requested by lender to maintain the

24    security interest created by this agreement as first priority

25    perfected security interest, subject to permitted liens, and

1  shall defend such security interest against the claims and

2  demands of all persons whomsoever.

3          Do you recall that sentence?

4  A.    I do.

5  Q.    And the next sentence says:  Each borrower will furnish to

6  lender from time to time statements and schedules further

7  identifying and describing the assets and property of such

8  borrower in such other reports in connection therewith as

9  lender may reasonably request all in reasonable detail.

10         Do you see that?

11  A.    I do.

12  Q.    And did Bay Point request statements, schedules or other

13  reports on Hoplite's assets?

14  A.    We did.

15  Q.    And on how many occasions has Bay Point made those

16  requests?

17  A.    Multiple occasions.

18  Q.    And has that information been provided from Hoplite

19  Bay Point?

20  A.    They have not.

21  Q.    Now let's touch to Section 8.8, the other provision

22  referenced in the second forbearance agreement as being in

23  default.  That section is titled misrepresentations.

24         Do you see that?

25  A.    I do.

1  Q.   And it says:  Any obligor or any person acting for any

2  obligor makes any representation, warranty or other statement

3  now or later in this agreement, any loan document or any

4  writing delivered to lender or to induce lender to enter this

5  agreement or any loan document and such representation,

6  warranty or other statement is false or misleading in any

7  material respect when made, that constitutes an event of

8  default under the loan agreement, right?

9  A.   Correct.

10  Q.   Okay.  And so what misrepresentations, if any, did

11  Bay Point believe had been made by the defendants to constitute

12  an event of default under Section 8.8?

13  A.   The most glaring one is obviously the Screen Media

14  contract that was falsified to show an amount payable to

15  Hoplite, obviously the SBA subordination that has recently come

16  to light, and then the multiple wire and ACH confirmations that

17  we have received that were not true and accurate.

18  Q.   Okay.  Let's talk about those.  So I'd like to switch

19  gears and turn to Exhibit J.

20       And this is an email chain, sort of in two parts,

21  first between you and Mr. Smith and then between you and

22  Mr. Needle.

23       The exchange between you and Mr. Smith is dated

24  Tuesday, November 17th.  Do you recall that exchange?

25  A.   I do.

1  Q.   And is that a true and accurate copy of that exchange with

2  you and Mr. Smith?

3  A.   It is.

4  Q.   And then the top half of the email chain is an exchange

5  between you and a man by the name of Mr. Seth Needle dated

6  December 1st, 2020.

7         Do you see that?

8  A.   I do.

9  Q.   And is that a true and accurate copy of your exchange with

10 Mr. Needle December 1st, 2020?

11 A.   It is.

12         MS. PEURACH:  Your Honor, I'd like to move Exhibit J

13 into evidence.

14         MR. COHAN:  Your Honor, there's hearsay in here

15 that's not authenticated, so there are multiple parts to it,

16 and there are communications to which this gentleman might have

17 knowledge, but there are other parts to which he does not,

18 like, for example, the Wells Fargo document.

19         THE COURT:  Well, I think the import of this is that

20 your client, or your client's representative, Mr. Smith, the

21 plaintiff says is making all of the representations in the

22 November 17, 2020 email.

23         So if you just cut it off there from the one that's

24 at 10/19 and look below, that is your client to this witness,

25 so that's a statement by a party opponent.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1        And one could argue that the attachment or the

2   forwarded email is hearsay within hearsay, but I think the

3   plaintiff's position is that it's not -- or that it is hearsay,

4   but it is also your client's statement, albeit written under

5   the name Seth Needle.

6        Is that your point?

7        MS. PEURACH:  Your Honor, it's -- our point with

8   respect to the first half of the email, yes, it's a party

9   opponent.  And I would add with the second half of the email

10  from Mr. Needle to us, it shows an inconsistent statement from

11  what is made, the statement made by his client to us, that

12  he -- the license agreement had been provided to us was

13  authentic and that the Wells Fargo ACH had been initiated.

14       THE COURT:  I agree.  I mean, I'm simply saying that

15  I think your position is that -- and I think Mr. Needle's

16  position is that he never sent the email at the bottom at 7:17

17  a.m.  He says --

18       MR. COHAN:  He does not say that.

19       THE COURT:  I did not ever send such an email?

20       MR. COHAN:  Right.  Because he thinks -- well, we

21  don't know why.  We don't know what he's talking about, because

22  he doesn't say.

23       THE COURT:  Okay.

24       MR. COHAN:  And it's rank speculation for us to try

25  to figure it out.  But there's no reference to the Wells Fargo

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  attachment at all and Seth Needle's email of November 17 at

2  7:17 a.m., and there's no reference to it in Jon Smith's email

3  of November 17, at 10:19 a.m.

4          THE COURT:  Okay.  Well, I'm going to overrule the

5  objection.  You can explore all of these things on

6  cross-examination.

7          MR. COHAN:  Sure.

8          THE COURT:  But I think that this is enough of a

9  statement by a party opponent, albeit not the top part, from

10  Seth Needle at 11:10 p.m. but I'll take that in context as

11  well.

12          Go ahead.

13          MS. PEURACH:  Thank you, Your Honor.

14          THE COURT:  But again, we all know that hearsay is

15  permissible in this hearing, but I can judge -- one of the

16  reasons for hearsay is because jurors are not maybe able to

17  properly assess it.  The second is because there's no

18  confrontation that is available.

19          MR. COHAN:  And, Your Honor --

20          THE COURT:  I understand that.  And you can confront

21  this witness and you can make the arguments about what you

22  might be able to prove if you could only confront somebody.

23  And I can weigh that into the credibility of it in a better way

24  than a jury could.  So that's why I think it's admissible in a

25  hearing like this.

```
 1              MR. COHAN:  Your Honor, I just want to say, you know,
 2  I don't want to be overly tedious.
 3              THE COURT:  I understand.  No, I get it.
 4              MR. COHAN:  And I'm not intending to be, but I do
 5  have a record to --
 6              THE COURT:  I understand.  I don't think you are
 7  being overly tedious.  I think it's a point worth making and
 8  you can cross-examine this witness as to what you think are the
 9  limitations of this document or the other limitations and the
10  implications the plaintiff is trying to make.
11              Go ahead.
12              MS. PEURACH:  Thank you, Your Honor.
13  BY MS. PEURACH:
14  Q.  So, Mr. Rierson, turning your attention to Exhibit J, it
15  is the sort of twofold email chains we were just talking about.
16  And I'd like to actually start with the second email from the
17  bottom to you.
18  A.  Um-hmm.
19  Q.  And that is from Jon Smith to you and Rob Moran dated
20  Tuesday, November 17th, 2020.
21              Do you see that?
22  A.  I do.
23  Q.  The subject is forward confirming, and the text of the
24  email only says:  Here we go.
25              Do you see that?
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  A.   Yes.  Yep, correct.

2  Q.   And so did you understand Mr. Smith to be forwarding you

3  an email communication?

4  A.   Yes.

5  Q.   And the email communication that you received, is that the

6  email communication below from Mr. Needle to Mr. Smith?

7  A.   Correct.

8  Q.   Okay.  Let's look at that email.

9        It says:  Jon, see below.  Again, as discussed, all

10 of our third-party payments have to be ACH.  It is sent,

11 though.  Thanks.  And let me know if you need anything further.

12        Do you see that?

13 A.   I do.

14 Q.   All right.  And do you -- did you see the signature block

15 of Mr. Needle --

16 A.   I do.

17 Q.   -- on that email?

18 A.   Yes.

19 Q.   And Mr. Needle purports to be the senior vice president

20 for World Wide Acquisitions for Screen Media Ventures; is that

21 correct?

22 A.   Yes.

23 Q.   And is Screen Media Ventures the entity with which Hoplite

24 had entered a license agreement?

25 A.   Correct.

1    Q.    And that license agreement, the accounts receivable,

2    served as part of the collateral of the loan; is that right?

3    A.    Absolutely.

4    Q.    All right.  So let's turn to the next page of Exhibit J,

5    which appears to be a Wells Fargo confirmation saying ACH is

6    being processed.

7            Do you see that?

8    A.    I do.

9    Q.    In the account field are the last four digits of an

10   account number.

11           Do those have any significance to you?

12   A.    Yes, that is to our account.

13   Q.    And the amount of the purportedly in-process ACH is

14   $1.488 million.

15           Do you see that?

16   A.    Yes, I do.

17   Q.    And did that amount have any significance to you as well?

18   A.    Yes, it's the exact amount that was owed to Hoplite per

19   the Screen Media agreement.

20   Q.    So what did you understand Mr. Smith to be communicating

21   to you when he forwarded this email to you on November 17th?

22   A.    That they were fulfilling their obligations and this

23   payment had been initiated and would be sent to us under --

24   under that agreement.

25   Q.    And did Bay Point ever receive that 1.4888 -- 488 payment?

1  A.   We did not.

2  Q.   All right.  And so what did you do when you realized the

3  payment hadn't made it to your account?

4  A.   You know, obviously we followed up with Jon on a daily

5  basis just to try to get confirmation that the ACH was sent.

6  And, you know, obviously, it not showing in our account gave

7  us, you know, cause for concern.

8       When we kept getting the runaround from Jon, I

9  reached out to Seth, via finding his email, you know, address

10  online and just forwarded him this email to confirm verbally

11  and personally, because, you know, what Jon was conveying was

12  not, you know, adding up.

13  Q.   And as your reach out to Mr. Needle reflected in the

14  December 1st email from you that says:  Hi, Seth, on

15  Plaintiff's Exhibit J?

16  A.   It is.

17  Q.   All right.  And you say:  Hi, Seth.  I hope all is well.

18  I wanted to touch base on your email below to Jon Smith, re the

19  ACH payment from Hoplite.  Can you please give me a call at

20  your convenience to discuss.

21       Do you recall sending that email?

22  A.   I did.

23  Q.   All right.  Let's look at Mr. Needle's response, which is

24  at the top of Exhibit J.

25       In this email, which comes shortly after the same

1  day, Mr. Needle writes:  Chandler, unfortunately, it appears

2  this is a scam, as I did not ever send any such email.

3          Do you see that?

4  A.   I do.

5  Q.   What did you do after receiving that email from

6  Mr. Needle?

7  A.   Yeah.  I immediately reached back out to him and asked him

8  to call me just to, you know, discuss the scenario that we --

9  you know, regarding the ACH and the agreement.

10         And after that, that following day, Seth Needle

11 called me and we had a discussion regarding the ACH and the

12 agreement.

13 Q.   So you did have a phone conversation with Mr. Needle?

14 A.   We did.

15 Q.   What did Mr. Needle tell you in that phone conversation?

16 A.   That the agreement we --

17         MR. COHAN:  Objection, hearsay.  What did Mr. Needle

18 tell you in that phone call.

19         MS. PEURACH:  So, Your Honor, we are not offering the

20 substance of that phone call from Mr. Needle for the truth of

21 the matter asserted, but only for the impact on Mr. Rierson and

22 his belief for the appropriateness of a receivership today.

23         THE COURT:  Okay.  I'm going to overrule the

24 objection, because first of all, I think that it is sufficient

25 to hear, in this instance.

**EXHIBIT K**
**PAGE 382**

```
 1              And second, I think I could, even if the rules
 2   applied, listen to it for the reason that has been proffered.
 3              Go ahead.
 4   BY MS. PEURACH:
 5   Q.   So if you could please tell us about the telephone call
 6   you had with Mr. Needle following the email in Exhibit J.
 7   A.   Yeah, he essentially outlined that they did have an
 8   agreement with Hoplite, but it was not as outlined to us, it
 9   was a revenue share agreement where Hoplite would participate
10   on a revenue-generated basis on ads on their platform.
11              So he confirmed that the section of the agreement
12   stating that $1.488 million that was owed was not true and
13   accurate and no monies were owed to Hoplite at that time.
14   Q.   Okay.  So.
15   A.   And then he also confirmed that the ACH was, you know,
16   falsified, that he never sent that email below.
17   Q.   Okay.  So just to be clear, so Mr. Needle told you that
18   Screen Media did not presently owe Hoplite any money?
19   A.   Correct.
20   Q.   And Mr. Needle, did he tell you that Screen Media had not
21   initiated a wire transfer for $1.488 million to Bay Point or to
22   Hoplite?
23   A.   He did.
24   Q.   And did Mr. Needle tell you that the pay structure of the
25   license agreement with Hoplite did not require an advance?
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1  A.    Correct.

 2  Q.    It was a revenue share agreement?

 3  A.    Correct.

 4  Q.    Did Mr. Needle provide you with his version of the license

 5  agreement with Hoplite?

 6  A.    Yes, he did.  Shortly thereafter the call, he forwarded it

 7  over to us and we could see the -- the discrepancies.

 8  Q.    All right.  Let's take a look at that.  And that's in

 9  Exhibit L.  This, too, is a document called license agreement.

10  This one is also effective July 1st, 2020 and says that it's

11  between Screen Media Ventures and Hoplite Entertainment.

12           Do you see that?

13  A.    I do.

14  Q.    Okay.  Is this Exhibit L a true and accurate copy of the

15  license agreement that was provided to you directly by

16  Screen Media?

17  A.    Yes.

18  Q.    And if you compare Exhibit L -- strike that.

19           MS. PEURACH:  Your Honor, I'd like to first move to

20  admit Plaintiff's Exhibit L into evidence.

21           THE COURT:  Any objection?

22           MR. COHAN:  I don't think this witness has any way to

23  know what this is or authenticate it.

24           THE COURT:  Well, he said it's a true and accurate

25  copy of what he received from Mr. Needle following their
```

1 | conversation, so I will admit it.

2 | BY MS. PEURACH:

3 | Q.   And so, Mr. Rierson, how did this license agreement in

4 | Exhibit L that was provided by Screen Media differ from the

5 | license agreement in Exhibit C that was provided on behalf of

6 | Hoplite?

7 | A.   Yeah.  The key aspects are Section C, in Section Number 2,

8 | that outlined that a payment was owed, I believe it was $12,000

9 | per episode.

10 |          And then also if you go to the exhibit, Exhibit A, he

11 | added, you know, the calculation showing -- or indicating a

12 | payment -- or an advance of 1.488 million was owed.

13 | Q.   So just to be clear, the license agreement provided to you

14 | by Screen Media in Exhibit L does not contain a section 2C; is

15 | that right?

16 | A.   It does not.

17 | Q.   Okay.  And then license agreement provided to you by

18 | Screen Media in Exhibit A does not state that there is a

19 | receivable of $1.488 million; is that right?

20 | A.   Correct.

21 | Q.   All right.  Now, you referenced another wire transfer

22 | notification from Mr. Smith that you believed to have been

23 | falsified.  So I'd like to direct your attention to Exhibit K.

24 |          Do you recognize this document?

25 | A.   I do.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  Q.   Okay.  The document appears to be an email from Mr. Smith

2  to you and Rob Moran, dated Saturday, November 21st, and the

3  subject is forward, Wells Fargo wire transfer initiated.

4           Do you see that?

5  A.   I do.

6  Q.   And is this a true and accurate copy of the email that you

7  received from Mr. Smith on Saturday, November 21st?

8  A.   It is.

9           MS. PEURACH:  All right.  Your Honor, I'd like to

10  move to admit Plaintiff's Exhibit K into evidence.

11           MR. COHAN:  I'm sorry, the date of receipt was

12  December 1st?

13           MS. PEURACH:  November 21st.

14           MR. COHAN:  November 21st.  Okay.  No objection.

15           THE COURT:  Okay.  It's admitted.

16  BY MS. PEURACH:

17  Q.   So, Mr. Rierson, we just went over the subject line here

18  is forward, Wells Fargo wire transfer initiated.

19           Do you see that?

20  A.   I do.

21  Q.   And so it -- do you understand this email to be forwarding

22  another message to you?

23  A.   Correct.

24  Q.   Was that the message below on Exhibit K?

25  A.   It is.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  Q.   All right.   Now let's look at that message.   This message

2  says it's from Wells Fargo online and its subject is Wells

3  Fargo wire transfer initiated.

4          Do you see that?

5  A.   I do.

6  Q.   And then the body of the document is labeled Wells Fargo,

7  your wire transfer is being processed.

8          Do you see that?

9  A.   I do.

10 Q.   And then it contains transfer details.

11          What did you understand Mr. Smith to be sending you

12 here?

13 A.   Confirmation of a $100,000 payment that he had promised

14 was being sent to us that day.

15 Q.   And is the account number on this purported wire transfer

16 confirmation significant to you in any way?

17 A.   Yes, it is our account number.

18 Q.   Okay.   Did Bay Point ever receive that $100,000 from

19 Hoplite or Mr. Smith?

20 A.   We did not.

21 Q.   Was $100,000 ever deposited in the specified collateral

22 proceeds account?

23 A.   It was not.

24 Q.   Okay.   Okay.   Mr. Rierson, so let's switch gears for a

25 minute.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          Now, you've looked into the fact that Hoplite and

2    Hoplite Entertainment are California corporations, correct?

3    A.    Right.

4    Q.    You determined that before you entered into the loan

5    agreement; is that right?

6    A.    Correct.

7    Q.    Okay.  After Hoplite defaulted on the loan, did you take

8    any steps to inquire into the status of their incorporation

9    with the California Secretary of State?

10   A.    We did.

11   Q.    And what did you discover?

12   A.    We obviously discovered a new UCC lien on the business and

13   that one of the businesses -- business license has been

14   suspended.

15   Q.    So let's start with the license.  If you could turn your

16   attention to Exhibit T.

17          Let me know when you get there.

18   A.    I'm there.

19   Q.    Do you recognize what this document reflects?

20   A.    I do.

21   Q.    And what is it?

22   A.    A business search on Hoplite and Hoplite Entertainment

23   with the California Secretary of State.

24   Q.    Okay.  So is this the result of the search of

25   Hoplite Entertainment's status of incorporation performed -- if

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  you look in the top left-hand corner, it looks like the date is

2  2/9/2021, so yesterday?

3  A.    Correct.

4  Q.    All right.  And it was obtained from the California

5  Secretary of State website; is that right?

6  A.    Yeah.

7  Q.    Okay.  The date was yesterday?

8  A.    Correct.

9  Q.    And this is a true and accurate copy of the business

10  search result that you obtained for Hoplite Entertainment Inc.?

11  A.    Yes.

12        MS. PEURACH:  All right.  Your Honor, I'd move to

13  admit Plaintiff's Exhibit T into evidence.

14        THE COURT:  Any objection?

15        MR. COHAN:  Same objections about timing of

16  disclosure and authentication.  We didn't know about this until

17  yesterday.

18        THE COURT:  Okay.  I'm going to overrule the

19  objection.  I thought they had raised this issue in their

20  complaint.

21        MS. PEURACH:  We had.

22        THE COURT:  I mean, I see that they pulled this

23  document more recently, but in the complaint they raise the

24  same issue, that it had been suspended, didn't they?

25        MR. COHAN:  They did.  And my clients paid it, but...

1          THE COURT:  Okay.  It's still showing suspended as of

2   yesterday?

3          MR. COHAN:  It is.  And payment may or may not by

4   itself eradicate the suspension.  I don't know if there is

5   something else that has to be done, but it's paid.

6          THE COURT:  Okay.

7   BY MS. PEURACH:

8   Q.   So, Mr. Rierson, it says:  FTB suspended under status.

9          Do you see that?

10  A.   I do.

11  Q.   Did you look into what that means?

12  A.   Yes.

13  Q.   And what does it mean?

14  A.   That the business has been suspended for unpaid taxes.

15  Q.   All right.  And let's see.  If you look at Exhibit U, do

16  you see that?

17         Is this the printout from the California Secretary of

18  State where you were able to determine the definition of what

19  FTB suspended means?

20  A.   Yes.

21  Q.   Okay.  And is this a true and accurate copy of your

22  printout from the California Secretary of State website?

23  A.   It is.

24         MS. PEURACH:  All right.  Your Honor, I'd move to

25  admit Plaintiff's Exhibit U into evidence.

EXHIBIT K
PAGE 390

```
 1              MR. COHAN:  No objection.

 2              THE COURT:  It's admitted.

 3   BY MS. PEURACH:

 4   Q.   So, Mr. Rierson, you mentioned additional liens on Hoplite

 5   and Hoplite Entertainment.  And so I'd like to stick with

 6   Hoplite Entertainment for a minute, since we're talking about

 7   their incorporation status.

 8              If you could look at Exhibit R for me.  Is this the

 9   result of the lien search you had performed for

10   Hoplite Entertainment after they defaulted on the loan?

11   A.   Yes, it is.

12   Q.   All right.  It actually looks -- on the upper right-hand

13   corner, the date is January 21st, 2021; is that right?

14   A.   Yes.

15   Q.   And this report was pulled from the California Secretary

16   of State; is that right?

17   A.   It is.

18   Q.   Okay.  Is this a true and accurate copy of the report you

19   had pulled?

20   A.   It is.

21              MS. PEURACH:  All right.  Your Honor, I move to admit

22   Plaintiff's Exhibit R into evidence.

23              MR. COHAN:  No objection.

24              THE COURT:  Okay.  It's admitted.

25
```

1  BY MS. PEURACH:

2  Q.   And so looking at this document, Mr. Rierson, if you turn

3  to the second page, it says:   CT lien solutions, UCC search

4  report.

5          Do you see that?

6  A.   I do.

7  Q.   And it looks like it lists five UCC liens filed against

8  Hoplite; is that right?  Hoplite Entertainment, I should say.

9  A.   Yes, that's correct.

10 Q.   And Number Four is -- actually, strike that.

11         Number Three appears to be a lien filed by secured

12 party Columbia State Bank, right?

13 A.   Correct.

14 Q.   And then Number Four, on October 1st, 2020, is the lien

15 filed by Bay Point; is that right?

16 A.   That is correct.

17 Q.   Okay.  And then there's Number Five, which is a lien filed

18 by Bondit, LLC, on December 8th, 2020; is that right?

19 A.   Yes.

20 Q.   And that was filed after Bay Point's lien?

21 A.   Correct.

22 Q.   Was that also filed after Hoplite had defaulted on the

23 loan?

24 A.   Yes.

25 Q.   Was that also filed after Hoplite had entered the first

1  forbearance agreement?

2  A.   It is.

3  Q.   Let's turn to Page 6 of Exhibit R, so it's the back of the

4  next page.

5          Is this the UCC-1 financing statement that was filed

6  by Bondit, LLC, in California against Hoplite Entertainment?

7  A.   It is.

8  Q.   All right.  And here, it provides a description of the

9  document -- the collateral provided for this UCC-1; is that

10 right?

11 A.   That is correct.

12 Q.   All right.  Let's look at that description.

13         It says:  The debtor hereby irrevocably and

14 unconditionally pledge, assign and grant to the secured party a

15 first priority security interest in all of the debtor's right,

16 title and interest in, to and under all property, tangible and

17 intangible, wherever located or situated and whether now owned

18 currently existing or hereafter acquired or created, including

19 but not limited to accounts, deposit accounts, equipment,

20 general intangibles, goodwill, inventory, investment property,

21 letter of credit writing, negotiable collateral, intellectual

22 property, insurance policies, cash, technology, supporting

23 obligations, debtor's right to its accountants receivables,

24 proceeds, any securities and all other personal property of the

25 debtors.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1            Do you see that?
 2  A.   I do.
 3  Q.   Okay.  So it includes like all of the debtor's accounts
 4  receivables.
 5            Do you see that?
 6  A.   I do.
 7  Q.   And did Bay Point understand that it had a first priority
 8  security lien pursuant to the loan agreement in certain of the
 9  debtor's accountants receivables?
10  A.   Absolutely.
11  Q.   All right.  And pursuant to the terms of the loan
12  agreement, did Bay Point also believe that it had been given a
13  first priority security interest in this same collateral?
14  A.   Absolutely.
15  Q.   All right.  And are you familiar with Bondit?
16  A.   I am.  They're a known media financier.
17  Q.   And would it -- is it surprising -- did it surprise you to
18  see that Bondit had filed an UCC-1 financing statement on the
19  same collateral that Bay Point had filed a UCC-1 financing
20  statement on?
21  A.   Very much.  They're a seasoned lender/financier in the
22  business, and I wouldn't believe they would do this without
23  some kind of subordination agreement with us.
24  Q.   Did Bay Point provide any sort of subordination agreement
25  to allow for this loan to Bondit?
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  A.    We did not.

2  Q.    Now, you also mentioned you conducted a lien search on

3  both entities.

4  A.    Correct.

5  Q.    Let's look at Exhibit Q.

6         And does this document reflect the results of the

7  lien search that you had performed on the Hoplite Inc. entity?

8  A.    It does.

9  Q.    And the date of these results is January 21st, 2021.

10 A.    Yes.

11 Q.    All right.  Is this a true and accurate copy of the report

12 that was generated for that lien search?

13 A.    It is.

14        MS. PEURACH:  Your Honor, I move to admit Plaintiff's

15 Exhibit Q into evidence.

16        MR. COHAN:  Your Honor, I have the same objection

17 about timing.  And I also, more specifically, note that this

18 document -- that these search results were generated on

19 January 21st, 2021, and so there's no reason why they couldn't

20 have provided this sooner, if it was important.

21        THE COURT:  What's your point with this document?

22        MS. PEURACH:  Your Honor, the point that we're trying

23 to establish is the potential for mismanagement and misuse of

24 the assets and so to show the number of liens existing on

25 property that has been pledged to our client.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1        THE COURT:  Okay.  I'm going to overrule the

2   objection.

3        Go ahead.

4        You can cross-examine on this, and, you know, I think

5   this is fair game when they have the burden of showing fraud.

6        If you think that you're being treated unfairly

7   somehow in your inability to respond to it, we can talk about

8   that at that time.

9        MR. COHAN:  I understand.

10        THE COURT:  Go ahead.

11   BY MS. PEURACH:

12   Q.   So, Mr. Rierson, turning to the second page of Exhibit Q,

13   it lists the results of the UCC search report.

14        Do you see that?

15   A.   I do.

16   Q.   And so going through this document for Hoplite, there

17   appears to be 25 liens that have been filed on the entities.

18        Is that a fair summary?

19   A.   Yes.

20   Q.   All right.  In addition to traditional UCC liens, the

21   summary indicates the filing of a number of state tax liens.

22        Do you see that?

23   A.   I do.

24   Q.   All right.  I'd like to direct your attention to the first

25   notices of state tax lien, which is on -- let's see -- Page 8

1   of Exhibit Q., and it's -- the date filed is 9/4/2020.

2             Do you see that?

3   A.    I do.

4   Q.    All right.  And this appears to be a state tax lien filed

5   against Hoplite for the tax period of January 1st, 2020 to

6   March 31st, 2020.

7             Do you see that?

8   A.    Yes.

9   Q.    And the total of the lien is for $6,607.99; is that right?

10  A.    Yes.

11  Q.    Okay.  And did this lien surprise you when you saw it?

12  A.    No.  I believe we identified this prior to closing our

13  loan.  And we made it a post-closing item to have that

14  satisfied within 30 days.

15  Q.    Okay.  So just to be clear, per the loan agreement,

16  Hoplite was required to cure this state tax lien in 30 days

17  after closing --

18  A.    Correct.

19  Q.    -- your loan agreement?

20            Okay.  Let's look to the next page, Page 10.  This is

21  another notice of state tax lien; however, this one is dated

22  December 11th, 2020.

23            Do you see that?

24  A.    I do.

25  Q.    All right.  And it's for the tax period of April 1st, 2020

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  to June 30th, 2020, and it's for a total of $12,197.51.

2          Do you see that?

3  A.    I do.

4  Q.    Do you recall finding this state tax lien in searching for

5  Hoplite?

6  A.    Yes, I do.

7  Q.    All right.  And this tax lien was filed after the parties

8  entered the loan agreement, right?

9  A.    Correct.

10 Q.    And this tax lien was filed after Hoplite defaulted on the

11 loan agreement; is that right?

12 A.    Yes, correct.

13 Q.    And this tax lien was filed after the parties entered the

14 first forbearance agreement; is that right?

15 A.    Yes.

16 Q.    Okay.  If you turn to the next page, there's another

17 notice of state tax lien.  This one's for the tax period of

18 October 1st, 2019 to March 31st, 2020.

19          Do you see that?

20 A.    I do.

21 Q.    Okay.  The total is for $15,324.93.

22          Do you see that?

23 A.    I do.

24 Q.    And do you recall finding that tax lien when you searched

25 for the liens filed against Hoplite?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    A.    Yes.

2    Q.    Now, this one's dated September 10th, 2020, prior to the

3    loan closing.

4    A.    It would -- yeah.

5    Q.    Did it surprise you to find this lien?

6    A.    Subsequently, yes, because it was a post-closing item as

7    well to be satisfied and paid within 30 days.

8    Q.    And so when you found this lien in January of 2021, it

9    indicated that it had not been cured; is that right?

10   A.    Correct.

11   Q.    Now, did you also conduct a search to see if any liens had

12   been filed against Mr. Smith?

13   A.    We did.

14   Q.    The personal guarantor of the loan?

15   A.    Yes, we did.

16   Q.    If I could turn your attention to Exhibit S.

17          Are these the results of the lien search that you had

18   performed on the guarantor?

19   A.    They are.

20   Q.    And is this a true and accurate copy of the lien results

21   that you found?

22   A.    It is.

23   Q.    And the date of this report is also January 21st, 2021,

24   right?

25   A.    Correct.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          MS. PEURACH:  Your Honor, I move to admit Plaintiff's

2    Exhibit S into evidence.

3          MR. COHAN:  Same objections.

4          THE COURT:  Objection's overruled.  It is admitted.

5    BY MS. PEURACH:

6    Q.   So, Mr. Rierson, turning to the second page of Exhibit S,

7    this is a report of outstanding UCC liens filed against

8    Mr. Smith.

9          Do you see that?

10   A.   I do.

11   Q.   Okay.  Did you also find a state tax lien that had been

12   filed against Mr. Smith?

13   A.   Yes.

14   Q.   Okay.  And that is on Page 6 of Exhibit S; is that right?

15   A.   Correct.

16   Q.   And the total amount, the balance is $33,988.58, right?

17   A.   Correct.

18   Q.   The date of this tax lien is also prior to the loan

19   agreement, it's September 22nd, 2020, right?

20   A.   Correct.

21   Q.   Did it surprise you to find the existence of this state

22   tax lien when you conducted the search in January of 2021?

23   A.   Yes.

24   Q.   And why is that?

25   A.   I was unaware of this tax lien.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

**EXHIBIT K**
**PAGE 400**

1  Q.  All right.  And sitting here today, Mr. Rierson --

2          THE COURT:  Did you say this one was in place before

3  you closed?

4          THE WITNESS:  Yes.  It looks like it was filed on

5  September 22nd.

6          THE COURT:  Yes.  So how didn't you know about it?

7          THE WITNESS:  I don't believe that we discovered that

8  prior to closing.

9          THE COURT:  Okay.

10  BY MS. PEURACH:

11  Q.  And so did it surprise you to learn that Mr. Smith had a

12  $33,988.58 tax lien filed against him?

13  A.  Absolutely.

14  Q.  Mr. Smith was the personal guarantor of the loan?

15  A.  He was.

16  Q.  And so just to be clear, sitting here today, Bay Point has

17  not received a single payment under the loan agreement or any

18  of the related loan documents from any of the defendants?

19  A.  No, we have not.

20          MS. PEURACH:  Okay.  No further questions at this

21  time, Your Honor.

22          THE COURT:  Cross-examination?

23          THE WITNESS:  Is this water in here?

24          THE COURT:  Is there water in there, Mr. Thurman?

25          COURTROOM DEPUTY:  Let me freshen it up.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1              THE WITNESS:  Okay.  If you don't mind.  I appreciate

 2   that.  My apologies.

 3              THE COURT:  That's fine.  Just get him some water out

 4   of our cooler.

 5              THE WITNESS:  Thank you very much.

 6              COURTROOM DEPUTY:  Okay.

 7              THE COURT:  You can go ahead.

 8              MR. COHAN:  Okay.  Thank you.

 9                        CROSS-EXAMINATION

10   BY MR. COHAN:

11   Q.   Mr. Rierson, it is true that your company makes loans to

12   those who don't have viable alternatives, correct?

13   A.   We are a private capital lender that specializes in

14   secured asset-backed loans.

15   Q.   The starting interest rate on this loan was 60 percent.

16   True?

17   A.   It was a short duration loan that was, you know, not

18   supposed to be outstanding more than two to three months, and

19   it carried a 5 percent per month interest rate.

20   Q.   And the APR on a 5 percent per month exceeds 60 percent

21   per annum, right?

22   A.   As I stated, it was a short duration loan.

23   Q.   Yes?

24   A.   Repeat the question, sir.

25   Q.   5 percent per month is more than 60 percent -- more than a
```

```
 1   60 percent APR?

 2   A.   Correct.

 3   Q.   Okay.  And since then, you've increased the interest rate

 4   pursuant to the forbearance agreements?

 5   A.   Yes.

 6   Q.   To more than 80 percent?

 7   A.   Correct.

 8   Q.   And you knew the defendants needed the money?

 9   A.   Yes.

10   Q.   You knew they weren't sitting on lots of free cash?

11   A.   Correct.

12   Q.   You knew they were waiting on payments.

13   A.   Thank you very much.

14            Yes.

15   Q.   They told you they were waiting on payments?

16   A.   Yes, correct.

17   Q.   And their ability to pay you was dependent on future

18   income?

19   A.   On the collection of those receivables?

20   Q.   Yes.

21   A.   Yes, and other obligation -- obligations that were owed to

22   them that were, you know, conveyed to us by Jon Smith.

23   Q.   All in the future?

24   A.   Correct.

25   Q.   You're not aware of any specific mishandling of money
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  since you've made the loan.  True?

2  A.   I am not.

3  Q.   So that's true, what I said?

4  A.   Correct.

5  Q.   You're not aware of any money going anywhere other than

6  where it was supposed to go since you've made the loan.  True?

7  A.   Yes, we have not had any -- any insight into the business

8  assets.

9  Q.   You're not aware of any deterioration in the finances of

10  the defendants since you have made the loan.  True?

11  A.   Like I said, we don't have any insight into the business,

12  so no.

13  Q.   That's true, what I said, correct?

14  A.   Yes.

15  Q.   Okay.  You're not aware of any imminent threat to the

16  financial circumstances of any of the defendants.  True?

17  A.   Repeat the question.

18  Q.   You're not aware of any imminent financial threat to the

19  finances of the defendants, like, for example, an immediately

20  pending foreclosure or a seizure or something that would impair

21  their ability to repay you?

22  A.   I am not.

23  Q.   Okay.  No -- no money has been paid into the collateral

24  account.  True?

25  A.   Correct.  No.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    Q.    Okay.  And there are no assets, no money for a receiver to

2    manage if one was appointed.  True?

3    A.    In the collection account, no.

4    Q.    Okay.  And the three receivables evidenced by Exhibits B,

5    C and D --

6           B, as far as you know, that's valid, real and exists,

7    right?

8    A.    As far as we're aware.

9    Q.    And D, that's valid, real and exists, right?

10   A.    Yes, as far as we're aware.

11   Q.    Okay.  And C, you say has been altered and L is the real

12   version; is that right?

13   A.    Yes.

14   Q.    Okay.  And so let's look at C first.

15          And your contention is that someone added to C on the

16   first page; is that right?

17   A.    Correct.

18   Q.    And you don't know who added that, if anyone, right?

19   A.    No.

20          THE COURT:  You got that from your contact, not from

21   the defendant?

22          THE WITNESS:  Correct.

23          THE COURT:  Although you later had conversations with

24   the defendant in which he -- I'm sorry, Mr. Smith, in which he

25   essentially affirmed the amount that was payable immediately

1  under that?

2          THE WITNESS:  Countless conversations pre-closing and

3  post-closing.

4          THE COURT:  And that email that he sent you?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Okay.  But you don't know who falsified

7  the document?

8          THE WITNESS:  Correct.

9          THE COURT:  If it was falsified.  Okay.

10  BY MR. COHAN:

11  Q.   And you didn't specifically discuss 2C of the agreement

12  with Mr. Smith.  True?

13  A.   We absolutely did.  I mean, that was our collateral.

14  Q.   You did.  Okay.

15          Now, 2C says 12,000 per episode paid within 45 days

16  of full delivery, right?

17  A.   Correct.

18  Q.   Okay.  And then if you turn to Exhibit A, the way you've

19  got this copied, it's a little different from how it is

20  attached to the complaint, but if you look at Page 5 of 7 that

21  has Exhibit A, your contention is that Mr. Smith or someone,

22  you don't know who actually, added episode count, 124 episodes,

23  advance total $1,488,000, right?

24  A.   That is correct.

25  Q.   Okay.  And your concern about Exhibit C is that that money

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1   is not forthcoming, according to Mr. Needle, right?

 2   A.    Correct.

 3   Q.    Okay.  And you haven't explored beyond that, right?

 4   A.    Correct.

 5   Q.    Okay.  Did you talk personally to Mr. Needle?

 6   A.    I did.

 7   Q.    Okay.  And that's what he told you?

 8   A.    Yes.

 9   Q.    Okay.  Now, if we look at your complaint --

10         MR. COHAN:  I'm sorry, Your Honor.

11   BY MR. COHAN:

12   Q.    Do you have a copy of the complaint in front of you?

13   A.    I don't believe I do.

14         MR. COHAN:  Your Honor, I can share my computer

15   screen with the witness.

16         THE COURT:  That's fine.

17   BY MR. COHAN:

18   Q.    Okay.  I want to direct your attention to Paragraph 17.

19         THE COURT:  Let me say this, are you okay with him

20   being that close to you?

21         THE WITNESS:  Yeah.  That's perfectly fine, yeah.

22         THE COURT:  Okay.

23         THE WITNESS:  As long as you're comfortable with it.

24         MR. COHAN:  Yes.

25         THE WITNESS:  Okay.
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  BY MR. COHAN:

2  Q.   And it says:  Based on the purported value of the accounts

3  receivable evidenced by the agreements, Hoplite,

4  Hoplite Entertainment and Smith provided to Bay Point, through

5  Josten, Bay Point elected to move forward with the lending

6  process.

7           Did I read that right?

8  A.   You did.

9  Q.   And it does say based on the purported value of the

10  accounts receivable, right?

11  A.   Yeah.  Yes.

12  Q.   Okay.  What is the value of the -- how did you calculate

13  the value of the accounts receivable?

14  A.   Based on the indication of how much was owed to Hoplite

15  via those distribution agreements.

16  Q.   Okay.  So you just took the amounts?

17  A.   Absolutely.

18  Q.   Okay.  Now, you didn't know when the money in B was

19  coming, right?

20  A.   Yeah.  Jon indicated those payments were coming within the

21  next -- you know, the payments were outlined in one of the

22  exhibits.

23  Q.   All Jon could tell you is he expected them to pay, right?

24  A.   Correct.

25  Q.   Okay.  And same for D, right, Jon could tell you he

1  expected them to pay, but he wasn't in control of the payments,

2  right?

3  A.   Yes.

4  Q.   Same is true for C, Jon Smith is not in control of any

5  payments, right?

6  A.   I don't believe any payments are due to him for -- for

7  that agreement.

8  Q.   For Exhibit C?

9  A.   Is that the Screen Media one?

10  Q.   Yes.

11  A.   Yes.

12  Q.   Okay.  And so did you discount the accounts receivable to

13  take into account the fact that you didn't know if the money

14  was actually going to come or not or when?

15  A.   We had sufficient collateral to securitize the $2 million

16  loan.  We also took a first priority lien in all of his

17  business assets, so that kind of gave us a backstop on the

18  collateral, so we felt sufficiently collateralized with the

19  receivables that were granted.

20  Q.   So you weren't concerned about the risk of any of these

21  particular accounts not making the payments because you had

22  enough other collateral?

23  A.   We were very concerned about the receivables being

24  collected.

25  Q.   But you didn't discount the value because you had enough

1 | other collateral, right?
2 | A.    What do you mean by discount?
3 | Q.    Well, you valued the receivables at face value?
4 | A.    Right.
5 | Q.    You didn't actually know if the money would materialize.
6 | A.    We had every indication to believe that he was owed
7 | $3.4 million, and that would sufficiently cover our $2 million
8 | loan.
9 | Q.    Okay.  Did you contact -- before making the loan, did you
10 | contact Big Media Holdings?
11 | A.    Yes.
12 | Q.    And did they confirm the agreement?
13 | A.    Yes, that was facilitated by Jon.
14 | Q.    Did you contact Screen Media before you made the loan?
15 | A.    Yes.
16 | Q.    Did they confirm that they had the license agreement?
17 | A.    Yes, but I think it's important to note that I believe
18 | that I spoke with Seth Needle prior to closing, and that call
19 | was coordinated by Jon.
20 |         But speaking to Seth once we discovered that this was
21 | falsified, that I did not, in fact, speak with Seth, that Jon
22 | had indicated it was someone else that I was speaking with.
23 |         THE COURT:  Wait a minute.  Before the closing,
24 | Mr. Smith put you in contact with somebody at Big Screen that
25 | you believed to be Seth Needle?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1             THE WITNESS:  Yes.

2             MR. COHAN:  That would be Screen Media, not Big

3  Screen.

4             THE COURT:  I'm sorry, Screen Media.

5             MR. COHAN:  Yeah.

6             THE COURT:  Subsequently, that's why you felt like

7  you could reach out to Mr. Needle later when you got the ACH

8  transfer?

9             THE WITNESS:  Correct.  I didn't have his personal

10 contact information, because, as I said, Jon coordinated that

11 conversation.

12            THE COURT:  Meaning that Jon called him and then got

13 you on the phone?

14            THE WITNESS:  Looped me in, correct.

15            So that's why I had to kind of do some research to

16 track down his email address to contact him directly.

17            THE COURT:  And then when you did that, and you

18 talked to Mr. Needle, you came to realize you had not, in fact,

19 spoken with him before?

20            THE WITNESS:  Correct.

21            THE COURT:  Because he said, hey, I've never spoken

22 to you before, or something to that effect?

23            You said, hey, when we spoke last time, you said X,

24 and he said I've never spoken to you?

25            THE WITNESS:  Correct.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          THE COURT:  So from that, you believe that Mr. Smith

2    got somebody else to impersonate Mr. Needle in verifying what

3    was owed by Big Screen -- or, I'm sorry, Screen Media?

4          THE WITNESS:  Correct.

5          THE COURT:  And you had a similar conversation with

6    somebody who you believed to represent BIG?

7          THE WITNESS:  Correct.

8          THE COURT:  And do you know if you really spoke to

9    somebody at BIG?

10          THE WITNESS:  I do not.  I'm not sure at this time.

11          THE COURT:  Again, that was facilitated by Mr. Smith

12   in the same way?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  And how about with Fight Channel, did you

15   speak to somebody there?

16          THE WITNESS:  Yeah.

17          THE COURT:  Facilitated the same way?

18          THE WITNESS:  Correct.  His name is Orsett.

19          THE COURT:  And in each of those instances with

20   Fight Channel and with BIG, did they say something to validate

21   the impending nature of the accounts receivable?

22          THE WITNESS:  Correct.  Essentially they -- they

23   confirmed that these -- the contracts were in place, and that

24   the amount on the agreement that we received was actually owed.

25          THE COURT:  And you don't know whether or not you

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  actually spoke to somebody at these other two companies,

2  because you don't have anybody to reach out to?

3          THE WITNESS:  Correct.

4          THE COURT:  But in each instance, Mr. Smith

5  facilitated it by having somebody else on the call that he

6  introduced you to as to somebody with these entities?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.  Thank you.

9  BY MR. COHAN:

10 Q.  Well, as to Screen Media, your pre-loan communication was

11 with somebody different than Mr. Needle, wasn't it?

12 A.  In what regard?

13 Q.  You didn't speak to Mr. Needle.  You spoke to somebody, I

14 think his first name is Richard?  He is since deceased.

15 A.  I do not recall a Richard.

16 Q.  Okay.  Do you have any notes from your conversation with

17 Mr. Needle pre-loan?

18 A.  Say that one more time.

19 Q.  Notes, anything to confirm that it was Needle who you

20 thought you were speaking with pre-loan?

21 A.  I do not.

22 Q.  Okay.  And even to this day, you haven't provided

23 Exhibit L, which is, in fact, a license agreement with

24 Screen Media, right --

25 A.  Correct.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  Q.   -- that Mr. Needle told you is a real license agreement,

2  right?

3  A.   It was indicated that they had went into this agreement,

4  but I do not believe the shows had been delivered, so the

5  license agreement was not effective or as effective as of that

6  day.  The license agreement contemplates the delivery of the

7  shows.

8  Q.   Yes.

9  A.   And they indicated that Hoplite entered into this

10  agreement, but they had not delivered those shows to

11  Screen Media.

12  Q.   My question is:  It's a real agreement, Exhibit L,

13  according to Mr. Needle.  Yes?

14  A.   Correct.

15  Q.   Okay.  There's some discrepancy about when -- when and how

16  money is going to get paid?

17  A.   Yeah, absolutely.

18  Q.   Okay.  And you also mentioned something called a direction

19  to pay.  Do you remember talking about that on direct?

20  A.   Yes, sir.

21  Q.   Okay.  And you provided to or received from a direction to

22  pay as to B, C and D, right?

23  A.   Correct.

24  Q.   Okay.  And so that's confirmation -- they didn't respond

25  and say what are you talking about, right?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  A.   Correct.

2  Q.   They said, sure, we'll -- we'll pay you when this money is

3  due?

4  A.   Jon facilitated those -- those conversations and those

5  agreements being executed.

6  Q.   Okay.  Well, sitting here, you don't have any evidence

7  that they're not real, do you?

8  A.   I have one evidence with Columbia.

9  Q.   Okay.  But as to B, C and D, you don't have any evidence

10 that these aren't real, do you?

11 A.   With B, C and D on the direction to pay?

12 Q.   Correct.

13 A.   I have evidence that the Screen Media is not, because they

14 confirmed that the person who signed that direction to pay did

15 not sign it.

16 A.   Where is that?

17 A.   Seth Needle indicated that to -- on the phone with us.

18 Q.   Okay.  But where is the direction to pay?

19 A.   Say that again.

20 Q.   Who signed it for Screen Media?

21 A.   It was some internal finance person who signed it.  I

22 don't recall the name on the agreement.

23 Q.   Okay.

24       THE COURT:  You got directions to pay from each of

25 the three companies?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          THE WITNESS:  Yes, sir.

2          THE COURT:  And you know the one from Screen is

3    wrong?

4          THE WITNESS:  Correct.

5          THE COURT:  But you don't about the other ones?

6          THE WITNESS:  Correct.

7          THE COURT:  I haven't seen that document.

8          THE WITNESS:  Huh-uh.

9          THE COURT:  Okay.  All right.  But you know that

10   fact?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.

13   BY MR. COHAN:

14   Q.   Now, you started working on this about August 25th of

15   2020; is that right?

16   A.   That's correct.

17   Q.   Okay.  Loan documents signed on September 30, 2020; is

18   that right?

19   A.   That's correct.

20   Q.   So more than a month of due diligence time; is that right?

21   A.   Correct.

22   Q.   Okay.  And you guys, you do this, this is your business,

23   right?

24   A.   Correct.

25   Q.   Okay.  And you did all of the due diligence you wanted to

1  do, right?

2  A.   Correct.

3  Q.   And you knew it was a risky loan, right?

4  A.   It was not portrayed to us as a risky loan.

5  Q.   These people weren't borrowing money from traditional

6  banks, right?

7  A.   They indicated they had a short-term liquidity crunch that

8  was going to be, you know, cured within a couple of months,

9  when these receivables were collected.

10 Q.   You discovered a bunch of tax liens before you made the

11 loan, right?

12 A.   Yes, but they were not material, and it's very common to

13 make those post-closing items.

14 Q.   You discovered other debts before you made the loan,

15 right?

16 A.   Yes, we did.

17 Q.   And the fact that the other lenders, including Columbia,

18 were willing to subordinate tells you that they had some

19 confidence in Mr. Smith and the defendants, right?

20 A.   Correct.

21          THE COURT:  Who agreed to subordinate?  Columbia said

22 they did not.

23          MR. COHAN:  Well --

24          THE COURT:  That's what you believe.

25          MR. COHAN:  -- he had subordinations from other

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1   lenders.

2          THE COURT:  Okay.

3          THE WITNESS:  Yeah.

4          THE COURT:  You believed --

5          THE WITNESS:  Correct.

6          THE COURT:  -- when you got subordination agreements

7   that those entities somehow had confidence in the defendant?

8          THE WITNESS:  Correct.

9          THE COURT:  But you don't know whether they were, in

10  fact, agreeing to subordinate?

11         THE WITNESS:  We believe that they -- led to believe

12  that they were subordinating, given that they signed the

13  subordination agreements.

14         THE COURT:  Yes.  But the one entity that's come

15  forward, the one test of that representation that we've done is

16  Columbia State Bank, which says not us?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay.

19  BY MR. COHAN:

20  Q.   Now, you didn't ever tender a recision of your agreement

21  with the defendants.  True?

22  A.   What do you mean by that?

23  Q.   You didn't ever say let's hit the rewind button, give us

24  back our money, we'll give you back your collateral and

25  security.  You didn't ever tender any kind of a recision,

1  right?

2  A.   No.

3  Q.   Okay.  And you first knew there was a problem around

4  November 17, 2020, when you didn't get $1,488,000, right?

5  A.   I believe it's an ACH payment, so those can take three to

6  four to five business days, so around November 17th is when we

7  first had the -- a red flag.

8  Q.   By November 25th, you knew something wasn't right?

9  A.   Correct.

10  Q.   Okay.  And then by December 1st, you had an email from

11  Seth Needle saying scam?

12  A.   Correct.

13  Q.   And you talked to Mr. Needle, who said there's problems

14  here, we didn't -- the agreement's not right and there's not

15  any money owed right now, and this is a scam, right?

16  A.   Correct.

17  Q.   That was on December 1st?

18  A.   Correct.

19  Q.   Okay.  And then you entered into two forbearance

20  agreements, right?

21  A.   We did.

22  Q.   Okay.  And the first of those was on December 4th; is that

23  right?

24  A.   Yes, sir.

25  Q.   Okay.  And if you'll turn to Exhibit H, that's the first

1  of the forbearance agreements, right?

2  A.   Yes, it is.

3  Q.   Okay.

4        MR. COHAN:  Your Honor, may I grab something really

5  fast?

6        THE COURT:  Yes.

7  BY MR. COHAN:

8  Q.   If you would direct your attention to 9(a)(2) -- no, well,

9  9(B)(2), I think.

10       THE COURT:  Of the forbearance agreement?

11       MR. COHAN:  Yes.

12  BY MR. COHAN:

13  Q.   I'm sorry.  9(a)(2).

14  A.   Do you mean 9(b)(2)?

15  Q.   9(A)(2).

16  A.   Okay.

17  Q.   Are you with me?

18  A.   Page 5?

19  Q.   It's in a block of text, but there's some -- there's an i,

20  a double ii.

21  A.   Okay, yes.  Yep.  Got it.

22  Q.   9(a)(ii) says:  The loan documents are in full force and

23  effect and are enforceable in accordance with their respective

24  terms.

25       Did I read that right?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

**EXHIBIT K**
**PAGE 420**

```
 1   A.    Yes.

 2   Q.    Okay.  And that document was executed on December 4th,

 3   three days after the scam email?

 4   A.    Yes.

 5   Q.    Okay.  And then if you would direct your attention to

 6   Exhibit I, which is the second forbearance agreement.  And

 7   that's dated December 21st.

 8         Do you see that?

 9   A.    I do.

10   Q.    Okay.  And if you'll direct your attention to the same

11   paragraph 9(a)(2), it also provides that the loan documents are

12   in full force and effect and are enforceable in accordance with

13   their respective terms, correct?

14   A.    Correct.

15   Q.    Okay.  And if you would please direct your attention to

16   Exhibit E, which is the loan agreement, right?

17   A.    Yes.

18   Q.    Are you with me?

19   A.    Yes, sir.

20   Q.    Okay.  And if you'll direct your attention to 11.1, and do

21   you see the language in 11.1 that starts:  All prior

22   agreements, and it's on the back of -- yeah, there you go, top

23   of the page.  All prior agreements, understandings...

24         Do you see that?

25   A.    Yes, I do.
```

1   Q.    Okay.

2   A.    Yep.

3   Q.    And it says:  All prior agreements, understandings,

4   representations, warranties and negotiations between the

5   parties hereto with respect to the subject matter of this

6   agreement and the loan documents, if any, are merged into this

7   agreement and the loan documents.

8         Did I read that right?

9   A.    You did.

10  Q.    Okay.  And then would you turn to 11.10.

11        And it says:  This agreement, together with the other

12  loan documents, embodies the entire agreement and understanding

13  among the parties hereto and supersedes all prior or

14  contemporaneous agreements and understanding of such person's

15  verbal or written, relating to the subject matter hereof and

16  thereof, and any prior arrangements made with respect to the

17  payment by borrower of, or any indemnification for, any fees,

18  costs or expenses payable to or incurred, or to be incurred, by

19  or on behalf of the lender.

20        Did I read that right?

21  A.    You did.

22        THE COURT:  Tell me again which provision you are

23  reading from, sir.

24        MR. COHAN:  11.1 and 11.10.

25        THE COURT:  And the significance of pointing this out

1    right now is what?

2              MR. COHAN:  These are merger clauses that merged all

3    of the -- all of the pre-loan discussions.

4              THE COURT:  Okay.  Are these questions that he needs

5    to -- I mean, you can argue this to me, but I want to get

6    him -- let him answer the questions you have that are factual

7    in nature.

8              MR. COHAN:  Sure.  Yeah.  And I'm almost finished.

9              THE COURT:  Sure.  Take your time.  Take your time.

10   BY MR. COHAN:

11   Q.   I did notice you said that on Exhibit J -- if you would

12   turn to the Wells Fargo ACH.

13             You see it says to account and it's -- the last four

14   digits are 4688?

15   A.   Correct.

16   Q.   Okay.  And you said that that's a Bay Point account?

17   A.   It is.

18   Q.   Okay.  Is that the Bay Point account that you provided

19   specifically for Mr. -- for the defendants to make payments to?

20   A.   No.  I believe that's our direct account and Jon agreed to

21   have them just wire the money directly to us versus to the

22   collection account.

23   Q.   Okay.  Now, did you do anything or not do anything

24   different based on having not received $1,488,000 on

25   November 17th?

1  A.    Absolutely.  He -- you know, we -- he -- the loan was in

2  default at that time.  And I believe this was a way for him to

3  stall and delay, you know, any kind of litigation or

4  foreclosure on our behalf.

5  Q.    Did it?

6  A.    Absolutely.

7  Q.    You entered into a forbearance agreement shortly after all

8  of this, right?

9  A.    We did.

10  Q.    Okay.  And if you would direct your attention to

11  Exhibit K, the last four digits of the to account are

12  different, it's 9437.

13        Do you recognize that account number?

14  A.    Yes, that is a separate account that we have.

15  Q.    Okay.  And so did you give Mr. Smith two different account

16  numbers?

17  A.    Yes.  I believe this was the account that we initially did

18  the loan with at closing.

19        The account that we gave him for the 1.4 was a new

20  account that we set up that we were trying to transition stuff

21  over to.

22  Q.    Okay.  But did you provide that account number to the

23  defendants?

24  A.    We did.

25  Q.    Okay.  And again, so this payment supposedly is

1   November 23rd for $100,000.  You didn't get it?

2   A.    Right.

3   Q.    Right?

4         Did you -- and then a short while later, you entered

5   into the first of the two forbearance agreements?

6   A.    Correct.

7   Q.    Okay.  Did the lack of these two payments, the Exhibit J

8   payment and the Exhibit K payment, did they encourage you to

9   enter into the forbearance agreements or discourage you from

10  entering into the forbearance agreements?

11  A.    Jon gave us reason to believe that he had additional money

12  coming to make a payment and we entered into those forbearance

13  and that's what led us to execute those agreements.

14  Q.    And you believed him?

15  A.    We had every reason to -- to -- to try to get some money

16  in the door.

17        THE COURT:  Well, that didn't really answer his

18  question.

19        The question was:  After you found out that he called

20  the email, that Mr. Needle called the email a scam, did you

21  believe Jon when you executed the forbearance agreements?

22        THE WITNESS:  It's -- it's hard to say.  There was a

23  pattern of lies that had occurred, but, you know, he was

24  somewhat persuasive to say, hey, I have another source of

25  capital coming in that I'm going to pay you $200,000.

```
 1              THE COURT:  Okay.
 2  BY MR. COHAN:
 3  Q.   And it would be true to say that today, whatever amount of
 4  money the defendants have coming to them is no different, as
 5  far as you know, from what it was on September 30th?  True?
 6              MS. PEURACH:  Objection; calls for speculation.
 7              THE COURT:  Say that question again.  Repeat your
 8  question.
 9              MR. COHAN:  All right.  I may not get every word
10  exactly right.
11              THE COURT:  Sure.  Sure.  That's okay.  I think I get
12  it.
13  BY MR. COHAN:
14  Q.   It would be fair to say that, as far as you know,
15  defendants have coming to them today, or not, exactly what they
16  had coming to them on September 30 or not, no difference?
17              MS. PEURACH:  Same objection.
18  Q.   Right?
19              THE COURT:  It is calling for speculation, but what's
20  good for the goose is good for the gander.  I can judge the
21  accuracy of the statement myself.
22              MR. COHAN:  Right.
23              THE WITNESS:  I would say on September 30th, we
24  believed $3.488 million was going to be collected, and I do not
25  believe that today.
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  BY MR. COHAN:

2  Q.   Okay.   That's a little different from what I'm trying to

3  get at.

4        Based on what you know today, whatever the defendants

5  had coming to them on September 30th is exactly what they have

6  coming to them today, based on what you know today?

7  A.   I can't make that judgment.   I don't have any insight into

8  their financials.

9        THE COURT:   Well, look at Exhibit O.   You believed

10  that on the Big Media, they were going to pay 50 percent, which

11  is $475,000.   That's what you believed?

12        THE WITNESS:   Correct.

13        THE COURT:   Do you have any reason to know either way

14  whether that's likely to happen?

15        THE WITNESS:   I do not.

16        THE COURT:   But you don't now believe that it's

17  imminent, as you did before?

18        THE WITNESS:   I do not.

19        THE COURT:   And in regards to Fight Channel, you

20  believed that they were expecting payment around November 15th,

21  but now you don't know whether that's true.

22        THE WITNESS:   (Nodding.)

23        THE COURT:   And maybe the most concrete is in regards

24  to Screen Media, you were told that they had -- that the

25  defendant had done everything they needed to do in order to

```
1   achieve the payment of 1.488, or whatever the number was?

2              THE WITNESS:  Correct.

3              THE COURT:  Now, at least, you know from Seth Needle,

4   they have not done what they needed to do to achieve that

5   money, right?  Because that money is not available as an

6   advance.

7              THE WITNESS:  Correct.

8              THE COURT:  That money has to be earned through their

9   share of advertising revenue that comes in?

10             THE WITNESS:  Right.  There was no specific amount

11  allocated.

12             THE COURT:  Right.

13             THE WITNESS:  Correct.

14             THE COURT:  In other words, that, you know now, not

15  to be an obligation that you relied upon?

16             THE WITNESS:  Correct.

17             THE COURT:  Okay.  All right.

18  BY MR. COHAN:

19  Q.   If you would direct your attention to Exhibit S, please.

20             And could you please turn to that tax lien page that

21  Ms. -- I'm sorry, that your counsel asked you about?

22  A.   Yes.

23  Q.   Okay.  Do you see the tax period for the amount -- for the

24  lien amounts?

25  A.   Yeah.
```

1   Q.   And that was 2006 and '7, right?

2   A.   Yes.

3   Q.   Okay.  And the assessment was 2010, right?

4   A.   Correct.

5   Q.   There's nothing new about this information in 2020, right?

6   A.   It appears to be filed in 2020?

7   Q.   Yes.  But the debt had been out there since 2006 and in

8   '7, right?

9   A.   Correct.

10          MR. COHAN:  Your Honor, that's all I have.

11          THE COURT:  Any redirect?

12          MS. PEURACH:  Very briefly, Your Honor.

13          THE COURT:  Okay.

14                    REDIRECT EXAMINATION

15  BY MS. PEURACH:

16  Q.   Hi, Mr. Rierson.  I want to clear up a little bit of the

17  testimony around the directions to pay.

18          I heard you testify that directions to pay were

19  provided such that the money purportedly due on the accounts

20  receivable from each license agreement would come directly to

21  Bay Point; is that right?

22  A.   That is correct.

23  Q.   Did you have any involvement, aside from the phone

24  conversations that you discussed, in obtaining those directions

25  to pay?

1  A.    No, I did not.  Jon facilitated them.

2  Q.    Okay.  In fact, since entering the loan agreement, have

3  you tried to reach out to Fight Channel or Big Media about the

4  status of funds that you believed to have been due to Bay Point

5  under those directions to pay?

6  A.    Yes.

7  Q.    And what happened?

8  A.    Both declined to disclose what the agreement is without

9  Jon's consent.

10 Q.    Okay.  Now, I also want to talk to you about -- when you

11 first testified on cross, you were discussing your knowledge of

12 potential threats to defendant's assets.

13        Sitting here today and since the loan agreement

14 closed on September 30th, have you been provided any insight

15 into defendant's assets?

16 A.    We have not.  We have not been provided bank statements

17 that we have requested or, you know, a current financial

18 statement.

19 Q.    And you've asked for that information?

20 A.    Yes.

21 Q.    And have you asked for that information more than once?

22 A.    Yes.

23 Q.    And you've given -- been given no access?

24 A.    Correct.

25 Q.    And under the loan agreement, you were required to be

EXHIBIT K
PAGE 430

 1  given access; is that right?

 2  A.   Yes.

 3  Q.   All right.  You are aware of a number of other debts to

 4  other creditors; is that right?

 5  A.   Correct.

 6  Q.   And you're aware that Bondit has filed a UCC first

 7  priority on the same collateral that you have; is that right?

 8  A.   Yes.

 9  Q.   Okay.  And you're also aware that Columbia State Bank

10  claims that --

11          MR. COHAN:  Objection, Your Honor.  I've not been

12  objecting based on leading, but, you know, this is just --

13          THE COURT:  Okay.  Try not to lead, but direct him

14  exactly where you want to go.

15          MS. PEURACH:  Yeah.

16          THE COURT:  Not what you want him to say, so we're

17  not meandering.

18          MS. PEURACH:  Yes.  And I only have one more

19  question.

20          THE COURT:  Okay.

21  BY MS. PEURACH:

22  Q.   And are you aware whether Columbia State --

23  Columbia State Bank believes it also has a first priority

24  position in the collateral that Bay Point believes it has?

25  A.   Yes, I am.

1  Q.   Okay.  And is that at odds with what Bay Point believed

2  its interest in the collateral was prior to learning of

3  Columbia State Bank's position?

4  A.   Yes.

5          MS. PEURACH:  That's it.

6          THE COURT:  Okay.  Let me ask you one other question,

7  or two others.

8          Would you go back to Exhibit O?

9          THE WITNESS:  Okay.

10          THE COURT:  As a result of Mr. Smith's response to

11  your first question, and to your second question, it appears to

12  me that you were led to believe that there was an obligation on

13  these two entities to pay, a current obligation to pay the

14  defendant about $1.963 million.

15          Do you agree with that?

16          THE WITNESS:  Yes.

17          THE COURT:  $475,000, because he says -- you see the

18  licensing agreement, it says that will be paid, they were

19  supposed to pay that after execution, that's your question.

20  Has the 50 percent been paid, been received already, per the

21  agreement.  It says 90 days after execution.  And he responds

22  they're set up to pay on the 15th.

23          THE WITNESS:  Correct.

24          THE COURT:  Outstanding obligation, just waiting for

25  the money to come in.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          THE WITNESS:  Correct.

2          THE COURT:  On the third one, in regards to Screen,

3   when are the episodes expected to be delivered?

4          He says:  Already delivered.  They're set to pay on

5   the 30th.

6          Meaning already delivered, the agreement you have

7   been provided, that would indicate current obligation to pay.

8          THE WITNESS:  Correct.

9          THE COURT:  Only the part from Therapy Dogs with

10  Fight Channel would have been something that the defendant

11  needed to do in order to have the right to a payment?

12         THE WITNESS:  Correct.

13         THE COURT:  Okay.  And the next thing I said is that

14  you were asked questions about sort of if you have any idea

15  whether there's any reason to believe there's less likely to be

16  payment.  I'm assuming now you would not trust anything

17  Mr. Smith said to you?

18         THE WITNESS:  Correct.

19         THE COURT:  All right.  Go ahead.  You can step down,

20  unless there is somebody else that wants to ask him a

21  follow-up.

22         You can step down.  Thank you.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Are there my other witnesses on this

25  topic?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
1              MR. WINSBERG:  No, Your Honor.

2              THE COURT:  Okay.  I'm going to short circuit this.

3  Does the defense have any witnesses on the issue of fraud?

4              MR. COHAN:  I do not, Your Honor.

5              THE COURT:  Does anybody want to make an argument

6  about the issue of whether there is evidence of fraud?

7              MR. COHAN:  I'd like to.

8              THE COURT:  Go ahead.  I'll lay out what I think, and

9  then you can respond to that.  That will give you a better

10 target.

11             I think there's lots of evidence of fraud.  From what

12 I've heard, I think this witness was very credible in what he

13 said.  I think there was the representations that were made in

14 O, Exhibit O, particularly in regards to Big Media and

15 Screen Media having an obligation at that time to pay were

16 fraudulent.

17             We know that's the case with Mr. Needle, because of

18 what we see in the email in which he explains that

19 Paragraph 2(c) was not even part of the agreement, or when he

20 provides the agreement, it does not have that, so I think

21 there's clear evidence of fraud right there by Mr. Smith.

22             The sort of allegation, the overarching allegation,

23 that they're owed about $3.4 million from three different

24 companies and that that payment was fairly imminent, 30 to 60

25 days, I think is what the witness explained, I think that was a
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

**EXHIBIT K**
**PAGE 434**

1 misrepresentation, a fraudulent misrepresentation, given the

2 other things that I'll say.

3         The false document I've already mentioned in

4 Exhibit C provides a reason to find that there is fraud here.

5         The false ACH transfers that were provided in J and K

6 provide reason to believe that there was fraud here.

7         The misleading document provided by

8 Columbia State Bank, allegedly subrogating their claim, when

9 you compare that to -- I think that's M and if you compare it

10 to V, and you listen to what Ms. Godfrey said in her email and

11 today, that it just simply was not signed by their people, yet

12 it was presented by the defendant, I believe it was the

13 defendant that provided that, right?  It wasn't the

14 intermediary, right?

15         MR. WINSBERG:  Yes, Your Honor.

16         THE COURT:  Is that right, Mr. Rierson?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Okay.  The repeated statement that he

19 would pay liens, tax liens after closing that were never done.

20         The ruse that he concocted to allow Mr. Rierson to

21 believe that he was speaking to Mr. Needle at Screen Media to

22 validate what was owed, and then Mr. Rierson learns later that

23 he never spoke to Mr. Needle and for all evidence never spoke

24 to anybody at Screen, because the things that he was told by

25 the alleged Screen representative, that was supposed to be

1  Mr. Needle, were not true.  And maybe that happened with the

2  other two.  We don't know.  What we do know is that Mr. Smith

3  set up that phone call, made the introduction, and did it for

4  the purpose of misleading Mr. Rierson, and to the effect of

5  misleading him.

6          Change of the terms in the forbearance agreement,

7  that's maybe not fraudulent, because at least let the guy catch

8  it, but it's pretty outside the realm of normal behavior.

9          And the failure to give access to the financial

10  statements, I think there's reason to believe there's

11  fraudulent intent there.

12          So if you could address those issues for me,

13  particularly the delta between what apparently Mr. Smith said

14  and what actually wound up being true, I'd like to clear that

15  issue first before we move on to what I think are more

16  difficult issues.  I don't think the fraud issue is a close

17  call here.

18          I suspect if your client was here, he might be taking

19  the Fifth, I don't know.  But I suspect if he was on the

20  witness stand, he might be doing that.

21          MR. COHAN:  Judge, I would say about the fraud issue

22  only, that we would very much like to have the opportunity to

23  investigate, do discovery, see what -- where that ends up.

24          And there's a lot of swirl, for sure, but you'd

25  expect that.  And I don't know what the explanations are.

EXHIBIT K
PAGE 436

1          In fact, I'll move for a continuance.  We haven't had

2    any time to investigate.  And I'd like time to investigate.

3    And so I'll move for a continuance right now to be able to

4    investigate those issues further, and then we reconvene.

5          But I don't have anything more to say to the fraud,

6    and that obviously I think -- I don't know if you want to hear

7    this now or at a different point in the proceeding, but if

8    there was fraud, it's waived.  It's waived by the two

9    forbearance agreements, it's waived by the conduct after the

10   November 17 ACH, it's waived by the conduct after the

11   November 23rd ACH, it's waived as to pre-loan communications by

12   the loan documents themselves that the plaintiffs prepared,

13   which merge everything in, and it's -- and it's waived by the

14   absence of any tender of recision, and so even if there was

15   fraud, it's waived.

16         THE COURT:  Okay.  Does that matter?

17         MR. COHAN:  It really does, because --

18         THE COURT:  Well, why does that matter?  Under the

19   law of receivership, the first thing I have to find is that

20   fraudulent activity has occurred or is likely to occur.

21         MR. COHAN:  So as to that first element, frankly, I

22   can't tell -- well, I can tell exactly what the list says, it's

23   in the conjunctive, so all of those things have to be

24   satisfied.  I don't know if the judge who wrote that intended

25   for it to be in the conjunctive or not, and I could see where

**EXHIBIT K**
**PAGE 437**

```
 1   somebody might say otherwise, but it's written in the
 2   conjunctive, and so if there's no fraud, not -- it doesn't --
 3   you know, I don't think it's enough that it happened, if it was
 4   waived.
 5           THE COURT:  Why, though?  Why would the fact that --
 6   well, I'm not sure how it's waived from Mr. Rierson trying to
 7   allow your client to negotiate away from the fraud.
 8           MR. COHAN:  Because -- I can answer.
 9           THE COURT:  Okay.  You could argue that -- well, how
10   is that waiving it?
11           MR. COHAN:  Because there's no viable fraud claim
12   here, and there's no viable RICO action here, because there's
13   no fraud.  It's been waived.
14           THE COURT:  I thought I have outlined what I think is
15   fraud, but why would that waive it?  Why would him not
16   canceling the agreement or exercising the full right under the
17   agreement, why the fact that your client encourages him to do a
18   forbearance agreement, why would that prevent him from
19   exercising his right to claim fraud now?
20           MR. COHAN:  Because the law, as I understand it, and
21   as we cited in the brief, Your Honor, is once you're on notice
22   of fraud, you either -- you have to relent, you either act
23   consistent with the fraud and repudiate the documents or you do
24   what they did here, which is reaffirm the documents and choose
25   to live by the documents.
```

```
 1              THE COURT:  Right.  But my point, though, is why does
 2    that stop him from coming in here in a receivership action and
 3    saying, Judge, in deciding whether or not you think that you
 4    should use your discretion to appoint a receiver, one thing you
 5    should know is you're dealing with a person who committed
 6    fraud.
 7              And you say, yeah, I committed fraud, but they can't
 8    use it against my client, because in their interaction before,
 9    when they were trying to work it out, they didn't repudiate the
10    documents?
11              MR. COHAN:  For the record, I'm 100 percent not
12    saying we committed fraud, my client.
13              THE COURT:  Okay.  So even if they did, it doesn't
14    matter.  It doesn't matter for receivership purposes, because
15    of the way they acted at the time later that they didn't
16    repudiate the documents.
17              MR. COHAN:  Right.
18              THE COURT:  I don't think they have to establish
19    their fraud claim in order to proceed -- all of the elements of
20    their -- well, I don't think they have to disprove your waiver
21    claim in order to meet the first element, which is just that
22    fraudulent activity has occurred.  I think that could stand,
23    even if for some other reason, the fraud wasn't actionable, the
24    fact that fraudulent activity has occurred or will likely occur
25    is enough.
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          MR. COHAN:  And I don't want to die on this rock,

2    because I think the other rocks are more important.

3          THE COURT:  Okay.

4          MR. COHAN:  But I will say if there's no fraud claim,

5    if there's no viable fraud claim and there's no viable RICO

6    claim, which I believe to be the case at this point, as

7    admitted by the plaintiff, then what you've got is just a

8    breach of contract.

9          And then when we start talking about, you know,

10   diminished assets and wasting and imminent threats and all,

11   none of that is here.

12         THE COURT:  Okay.  Mr. Winsberg, what do you say

13   about the idea that your client can no longer claim fraud

14   because they didn't repudiate it at the time and that they also

15   can no longer seek a receiver because of that?

16         MR. WINSBERG:  Yeah.  I think Your Honor hit it on

17   the head.  Two points, the argument that plaintiff's [sic]

18   counsel is making misses the mark.  There's a difference

19   between proving fraud for purposes of getting a receiver

20   appointed and proving fraud as part of your cause of action for

21   a recovery.  We're not here today on a trial on the fraud claim

22   in the complaint.  We're here today on the appointment of a

23   receiver.

24         I'd also note that based upon the fraud that has been

25   presented, and the Court found, that there is a likelihood of

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  fraud in the future.  And that it's in the "or," it's fraud now

2  or likely in the future, and I think we meet that standard.

3        The other part, Your Honor, is just if you go to

4  forbearance agreements, the argument and the notion that by

5  working with a defaulted borrower and guarantor you've somehow

6  waived your rights, it's just -- it's just not true.

7        And so if you were to look at the forbearance

8  agreements, if you were to look at paragraph -- if you go to

9  Exhibit H, H and I are similar, the first and amended

10  forbearance are very similar in the documentation.

11        If you were to look at Exhibit A, and you go to

12  Exhibit H, and if you go to Paragraph 11.

13        Okay.  There is a specific provision in there talking

14  about pure remedies non-waiver, which defendant's counsel

15  neglected to point to the Court's attention.

16        But if you look and go to subpart B, so 11(b) on

17  Page 7 in Exhibit H:  Except as otherwise specifically and

18  expressly stated herein, lender's execution or a performance

19  under this agreement, the forbearance agreement, does not and

20  shall not be construed so as to waive, relinquish, restrict or

21  limit in any way any of the rights, claims or causes of action

22  that lender has or may have with respect to the loan documents

23  or applicable law, all of which are expressly preserved,

24  regardless of whether any of the foregoing relate to, arise out

25  of acts, omissions, events or transactions occurring before or

1   after the date thereof.

2          And then you have another provision, C, beneath it,

3   that says that nothing in this agreement or related agreements

4   shall constitute a waiver of any existing or future default --

5   or event of default to the extent not expressly provided herein

6   any rights and remedies of the lender.

7          THE COURT:  I get the idea of repudiation, that if

8   you know about the fraud and then you act in a manner

9   inconsistent with repudiating the contract, that you can then

10  not claim fraud.

11          But how is it that when you have -- I mean, here they

12  actually did more, they actually imposed a $200,000 penalty, I

13  think, because of the breach.  And they specifically said we're

14  not waiving our remedies.

15          So do you have any law that says even if we say we're

16  not waiving our remedies, we're not waiving our rights, that

17  you can impose a waiver on somebody because they are trying to

18  dig out of a hole that somebody's put them in?

19          I mean, I think that's what happened here.  I think

20  that they realized that they were in a tough spot and they

21  thought either we go to war right now or we give this company

22  one more chance to fix it, or two more chances to fix it, and

23  then we're going to make sure that we can then go to war later.

24          MR. COHAN:  And that's exactly what Mr. Rierson said.

25          THE COURT:  Right.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          MR. COHAN:  He said we were trying to get our money.

2          THE COURT:  Yes.

3          MR. COHAN:  But that's exactly what the repudiation

4    issue is all about.

5          THE COURT:  I don't think so.  I don't think so.  I

6    think repudiation is when you know something and then you just

7    go gladly on and the idea is how can I complain about something

8    that I knew about and I continued on.  This is not continuing

9    on.  This is giving a guy one more chance, it's a forbearance

10   agreement, not a waiver and repudiation agreement.

11         MR. COHAN:  Even the -- even this 11(b) reaffirms the

12   loan documents, it -- it's a non-waiver as to all of those

13   things, blah, blah, blah, with respect to the loan documents.

14         MR. WINSBERG:  Or applicable law, I mean --

15         THE COURT:  So now you're saying that they can't

16   raise it because of the merger agreement in the loan document.

17         MR. COHAN:  Right.

18         THE COURT:  That's a little different argument, but

19   what do you say about that?

20         MR. COHAN:  Or both.

21         MR. WINSBERG:  I would say, Your Honor, there was

22   fraud that's come to light before the loan documents originated

23   were found and after the loan documents were found -- were

24   signed.

25              And certainly fraud between the timing of the loan

EXHIBIT K
PAGE 443

```
 1  documents signing and the forbearance signing.  And then we've
 2  discovered fraud after the forbearance agreements have been
 3  signed as well.  You know, so I don't think the whole argument
 4  holds any water.
 5          I'd also point out in this -- in the first amended
 6  forbearance agreement, they admit -- I don't know why we're
 7  arguing this -- they admit they've made misrepresentations
 8  under the loan documents, and we preserved our rights and
 9  remedies in connection with that forbearance agreement.
10          So the idea that somehow the misrepresentations that
11  we were aware of somehow bar us from pursuing our claims is
12  just -- it's just not what the documentation provides.
13          As Your Honor correctly noted, that this is not an
14  amendment of a loan and a waiver of defaults, there are
15  defaults for breach of contract, there are defaults for fraud
16  and misrepresentations.
17          And if you look at Exhibit I in the second
18  forbearance, they acknowledge the non-monetary defaults,
19  including under 8.8 of the loan document on Page 1 on Exhibit
20  I.  And of course if you go to Exhibit E -- and Mr. Rierson
21  testified to it, as to the elements of what they were in 8.8 --
22  they're misrepresentations.
23          There is no evidence in front of the Court and no
24  documentation in front of the Court that we have waived -- that
25  plaintiff has waived anything.  The idea of a forbearance is do
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

**EXHIBIT K**
**PAGE 444**

1  you acknowledge -- do the borrowers acknowledge the defaults,

2  acknowledge that these events have occurred, acknowledge that

3  the claims are due and owing in the amounts set forth in the

4  forbearance, and you acknowledge that you have no counterclaims

5  or causes of action against the plaintiff, the lender in this

6  case.

7        And that you reserve rights, the lender reserves

8  rights.  So they have waived all of their rights.  They have

9  released Bay Point, which he's neglected to mention, which is

10 in Paragraph 12 of the forbearance agreements.  They've

11 acknowledged the defaults, including the misrepresentations, so

12 the idea that -- I don't think it's relevant, the argument of

13 waiver in connection with the receiver on element one of fraud,

14 but even if it somehow is germane, it just isn't accurate to

15 say -- and he's citied no laws to the contrary -- that somehow

16 the forbearance agreements have waived fraud in this case.

17        MR. COHAN:  Judge, three points.  Three points.  As

18 Your Honor has correctly observed, any fraudulent

19 misrepresentations that predated the loan were merged by the

20 document.

21        THE COURT:  I didn't say that.  I was saying that you

22 said that.

23        MR. COHAN:  You pointed to that a moment ago, so -- I

24 don't want to overstate, but that is our position.

25        So the fraud that they're complaining about, the

1  actionable fraud is what predated the loan.  They talk about

2  what Your Honor called fraudulent activity that postdated the

3  loan, but there's no reliance and there's no harm, so there's

4  no fraud claim that arises out of that.

5        MR. WINSBERG:  But the record doesn't show that.

6        MR. COHAN:  But there's -- but there's no -- there's

7  no fraud claim because they merged it when they entered into

8  the loan agreement, which they didn't have to do, it's their

9  document, they did it, and they waived it later, even if they

10 hadn't merged it.

11       MR. WINSBERG:  That's not the law.  That's not the

12 law, and that's not what's in the record.

13       THE COURT:  Hold on.  Let him finish.  Let him

14 finish.

15       MR. COHAN:  And then you asked me if I had legal

16 authority.  I've never seen a case that says what the Court is

17 asking about, which is that you don't waive the fraud -- you

18 could somehow reaffirm the documents with the merger clause in

19 them and not -- and at the same time not waive the fraud.

20       And I feel sure that the plaintiff, who is well armed

21 and prepared, would have come to court with that legal

22 authority if they could have found it.  I just don't think

23 that's the law, but I don't think we have to cross that bridge

24 today, because I think for all the other five elements --

25       THE COURT:  What about the exact statement, except as

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1 specifically stated herein, the lender's execution of this

2 agreement does not waive any of the rights, claims or causes of

3 action it has or may have under the loan documents?

4        MR. COHAN:  Yeah, but they -- right.  So they

5 reaffirmed the loan documents.

6        THE COURT:  No, no, no, no, no.  See, you're pivoting

7 to the loan documents -- you say that they can't reaffirm the

8 loan document and then claim fraud, but what that provision of

9 the contract does, I think, being labeled non-waiver, says

10 whatever rights we have as of now, we're not foregoing those

11 rights simply because we're entering into this new agreement to

12 establish new obligations.

13        MR. COHAN:  Well, Judge, I would say even if you're

14 right, which I respectfully disagree --

15        THE COURT:  I don't see how it could be anything

16 else.

17        MR. COHAN:  But even if you're right, they had no

18 fraud claim by the time they get to this forbearance.

19        THE COURT:  But does the merger clause in here -- I

20 don't see any non-reliance term in the loan agreement.  I see a

21 merger clause that you pointed out.  Does that prevent a fraud

22 in the inducement?

23        MR. COHAN:  Yeah, I think that's exactly -- that's

24 exactly the provision that relates to fraud in the inducement.

25        THE COURT:  And I think most of the time you have a

EXHIBIT K
PAGE 447

1   non-reliance agreement.  We're not relying upon anything that

2   you've said.

3           MR. COHAN:  That's all in here, I believe.

4           THE COURT:  Is it?

5           MR. WINSBERG:  I don't believe so, Your Honor.  The

6   merger clause doesn't bar the fraud claim, but I also feel like

7   it's as if we're getting off track, Your Honor.

8           As Your Honor correctly noted earlier, what's in

9   front of you is whether there has been proof that fraud has

10  occurred or is likely to continue to occur, and as Your Honor

11  has noted, there is ample evidence of fraud for purposes of a

12  receiver.

13          THE COURT:  All right.  Let's go on to the next

14  point.

15          MR. COHAN:  Your Honor just to satisfy your

16  curiosity, 11.1 says:  All prior representations, warranties

17  and negotiations are merged.

18          THE COURT:  11.1 of which agreement?

19          MR. COHAN:  P, the loan documents.

20          THE COURT:  You mean the merger agreement?

21          MR. COHAN:  Yes, sir.  But it specifically talks

22  about representations and negotiations being merged.

23          THE COURT:  Well, I'm not sure that's the same thing

24  as a --

25          MR. COHAN:  Well, representations are exactly what

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1   they're pointing --

2           THE COURT:  -- clause that would exclude a fraudulent

3   inducement.  But that, I think, is also an issue for another

4   day.

5           I think there is plenty of evidence that the

6   defendant engaged in fraudulent activity in order to receive

7   the $200,000 loan, and then the forbearance of it, of

8   termination and the rights that the plaintiff had.

9           The party seeking receivership has a valid claim to

10  the property that is subject to the proposed receivership.  Is

11  there any dispute about that?

12          MR. COHAN:  I'm sorry.  One more time.

13          THE COURT:  Well, the party seeking receivership has

14  a valid claim to the property that is subject to the proposed

15  receivership.  What is it you're seeking in the receivership?

16          MR. WINSBERG:  We're seeking to appoint a receiver

17  over the collaterals defined in the loan documents, Your Honor.

18          THE COURT:  That is all of their property?

19          MR. WINSBERG:  Correct, Your Honor.

20          THE COURT:  And including the accounts into which the

21  payments were to be made?

22          MR. WINSBERG:  Correct, Your Honor.  We have

23  Mr. Rierson's testimony plus the loan, the note, the guarantee,

24  the first forbearance -- the first forbearance, the second

25  forbearance agreements plus the UCCs all in front of

1 | Your Honor, just to establish we have a valid claim.  Like I
2 | said earlier, because of the fraud --
3 |      THE COURT:  You can't say you have the only claim.
4 |      MR. WINSBERG:  Correct, Your Honor, because of the
5 | fraud brought to the attention by Columbia Bank, we do not know
6 | whether we are first priority, but we do -- we have established
7 | we have a valid claim to the collateral.
8 |      THE COURT:  Mr. Cohan, what do you say about that?
9 |      MR. COHAN:  Your Honor, what I have to say about that
10 | simply is that I do think that there is some question about
11 | what the plaintiff has a claim to, given the fact that it may
12 | or may not be in a priority position.
13 |      THE COURT:  But vis-a-vis your client, they have a
14 | claim to it?
15 |      MR. COHAN:  I mean, the document speaks for itself.
16 | I can't --
17 |      MR. WINSBERG:  We have two forbearance agreements,
18 | whether they acknowledge it and admit the amount of the claim,
19 | and then we have a security interest in the collateral, as well
20 | as the testimony.
21 |      THE COURT:  Okay.  Imminent danger the property lost
22 | or diminished in value.
23 |      MR. COHAN:  Mr. Rierson testified under oath that
24 | there was none.
25 |      THE COURT:  What do you say about that?  How do you

1  prove that?

2         MR. WINSBERG:  Well, Your Honor, it's a little

3  difficult, because they're taking advantage of their own

4  misconduct.  You know, they breached out the loan documents by

5  not providing any of his financial information, as Your Honor

6  noted as part of the fraud claim.

7         We do know that without a receiver appointed, the

8  same person that committed the fraud is going to continue on

9  operating these businesses using our collateral.  And we know

10 Mr. Smith has tax liens against himself personally.

11        We also know from their -- from the defendant's

12 brief, they admit they're operating and paying claims, but they

13 haven't paid us anything, and haven't given us an accurate

14 picture of the assets and liabilities, despite the fact it's

15 required under the loan documents and Mr. Rierson has asked, it

16 hasn't been provided.

17        And then we know that they've even took out a loan

18 from Bondit in violation of our loan agreement, putting another

19 lien on the collateral.

20        Any way -- any way you look at it, that's impairing

21 our collateral, that's another lender putting its claims as to

22 the collateral on this case.

23        And we know from the California website that

24 Hoplite's status is listed as suspended, that's the only

25 evidence.

EXHIBIT K
PAGE 451

1          And we know, despite the contractual agreements this

2     Court found in Section 3.2, there were two tax liens that were

3     supposed to be paid post-closing, which haven't been paid,

4     which impairs the collateral.

5          And then on top of that, as Mr. Rierson testified, we

6     have four other California tax liens, all in Exhibit Q, that

7     remain unpaid that have occurred -- that have been filed since

8     the loan closed.

9          So the idea, with all these new liens that

10    potentially impair the collateral, you know, their statements

11    on one hand that they're operating and paying claims, yet we're

12    not getting a complete picture or any picture at all as to

13    their assets and liabilities, along with the other collateral,

14    and look at who's running this business, in light of the

15    Court's findings, I don't know how you -- I don't know how you

16    find otherwise that there's not an imminent danger that the

17    collateral is going to dissipate or diminish.

18          THE COURT:  Mr. Cohan?

19          MR. COHAN:  Nobody's doing anything.  There is no

20    collection.

21          THE COURT:  Say again.

22          MR. COHAN:  No one is doing anything.  There is no

23    collection.  There is no imminent threat or danger of anything.

24          THE COURT:  But isn't that the danger, that there is

25    some -- it appears from the documents, there is some right to

1   revenue from these three agreements.  Isn't the danger that

2   your client will at some point have a right to that, and then

3   what was meant to pay them will be used for something else?

4        MR. COHAN:  There's no evidence of that, there's

5   no -- there's no evidence that he's got his hands on anything

6   that he could do anything with.  There's no evidence that he --

7        THE COURT:  Well, then why don't I let them take your

8   client's deposition next week.

9        Do y'all want to do that?

10       MR. WINSBERG:  Sure.  I mean, we would like

11  Your Honor to order them to turn over a complete picture of

12  their assets and liabilities, like tomorrow, with all their

13  cash transfers and bank statements going back the last two

14  years.

15       THE COURT:  I will do that.

16       MR. COHAN:  Oh, give me a little time.

17       THE COURT:  Why?

18       MR. COHAN:  Because, first of all, I know when I

19  talked to my client earlier today, he was seeing his dad in

20  Florida, who is ill, so I don't know if he's in his office,

21  but --

22       THE COURT:  Where does he live?

23       MR. COHAN:  In California.

24       THE COURT:  Why doesn't he stop here on the way back

25  and we'll have a hearing and you can do the testimony live?

1          MR. COHAN:  When?  Tomorrow?

2          THE COURT:  Yeah, sure.

3          MR. COHAN:  Judge, can we do this next week?

4          THE COURT:  Well, I don't know.  I feel like I need

5    to do something, because I feel like -- I don't know how

6    imminent the payment is.  I think that's the issue here, is the

7    imminency of the injury.

8          MR. COHAN:  And by the way, there is a live dispute

9    about personal jurisdiction and venue here.

10         THE COURT:  Okay.  Well, we can talk about that, and

11   we ought to do that, because I care a lot about the

12   jurisdiction.  I don't want to overstep jurisdiction, but I

13   think your client came to somebody in Georgia for a loan.

14         MR. WINSBERG:  It's not just that, Your Honor.  The

15   forbearance agreements both -- he acknowledges and wavies -- he

16   acknowledges and consents to the jurisdiction and venue in this

17   Court.

18         THE COURT:  Okay.  We'll get to that on another day,

19   if that arises.  I think there is enough that I am not pumping

20   the brakes on that myself, and nothing else has been put to me.

21         I think they have shown me enough to get a receiver.

22   I don't think there's going to be a remedy available to them.

23   If what is due under these three contracts has dissipated, and

24   everything your client has said to me -- not said to me --

25   everything that I have seen of your client in this case so far

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1 tells me that he has committed fraud and is unlikely to use the

2 money he has coming in to pay the people that he owes it.

3          MR. COHAN:  Judge.

4          THE COURT:  Let me finish.  The thing that concerns

5 me, I think there is an imminent injury, I think there's not

6 likely to be a remedy to them.  I think the greater good is on

7 their side, in the other elements that I've talked about.

8          But the strongest argument you make is that if I do

9 this, it will ruin the business.  I don't know if that's true

10 or not.  I don't see any evidence on you from that, and I don't

11 see how it could be.  We have a gentleman who could become the

12 receiver and all he then does is collect the money and then

13 your clients can explain where the money is supposed to go.

14          But this gentleman and his company have a pretty

15 strong claim that any money that comes in on those three

16 agreements ought to go to them.

17          MR. COHAN:  There is a super easy lesser remedy.

18          THE COURT:  Perfect.  Then you tell me what it is.

19          MR. COHAN:  Order an injunction, enjoin the

20 defendants from disbursing any money received into any of the

21 corporate accounts after today without an order from the --

22          THE COURT:  What do you say about that?

23          MR. WINSBERG:  It doesn't work, Your Honor, because

24 our collateral package, and the lender's collateral package is

25 broader than those three agreements.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1              THE COURT:  Because it has all of the other assets?
 2              MR. WINSBERG:  That's correct, Your Honor.
 3              THE COURT:  Why don't we do this.  I think the way
 4   your client has done this, particularly the idea that false
 5   people are talking to people on phones and things like that, I
 6   think we need to go to the entities that owe the money.  I
 7   think you-all ought to agree to an injunction for now, that
 8   allows me to enjoin them from paying anybody other than
 9   whatever account you-all agree to.
10              MR. COHAN:  Right.
11              THE COURT:  Does that give you at least 60 percent of
12   what you're looking for?
13              MR. WINSBERG:  It's helpful, Your Honor, but it does
14   not deal with the issue.  We don't know what other collateral
15   is out there, whether assets are there, and whether those are
16   being dissipated, as we speak and once --
17              THE COURT:  Well, and I don't know that either.  And
18   so when I look at the element that has to do with the
19   collateral, or whether there's likely to be a diminishing in
20   value, I look at primarily those three accounts.  Those three
21   accounts are what your client lent on.  They are, I suspect,
22   your client's primary hope of getting repaid.  And I will give
23   you the discovery you need to go and do the other things you
24   want to do.
25              MR. WINSBERG:  Yeah, we would want as part of that,
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1 | you know, immediate turnover of the books and records.  And we

2 | would also want, Your Honor, you know, an injunction enjoining

3 | him until there's a receiver in place for making decisions from

4 | making material transfers out of the businesses.

5 |      MR. COHAN:  And I'm fine with you enjoining the three

6 | companies from disbursing to anybody other than a designated

7 | account.

8 |      THE COURT:  Okay.  I would like you-all to prepare

9 | for me an injunction tonight or tomorrow -- I think there is

10 | all kinds of bases for an injunction here.  I think they've got

11 | a high likelihood of success.  I think there's a real chance of

12 | irreparable injury.  I think the fact that the public interest

13 | weighs in favor of this, and I think that the gravity of the

14 | damage weighs in favor of it as well.

15 |      It also can be a stopgap measure that is short of me

16 | doing a receiver.  And I'm not putting that outside of the

17 | realm.  I'm simply saying when I look at the imminent injury,

18 | yes, I guess there's other collateral that you have, I know you

19 | do, you have essentially everything, but there might be a

20 | number of other companies that do, too, including the bank, so

21 | I'm a little hesitant to overreach into that right now when

22 | what you've shown, I think, is the imminency of the assets that

23 | really you have a priority on.

24 |      MR. WINSBERG:  Which is why we really wanted the

25 | receiver, Your Honor.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
1              THE COURT:  I know, to go in and figure it out.

2              MR. WINSBERG:  To figure it all out and to have --

3              THE COURT:  But they tell me that appointing a

4  receiver is going to ruin their company because it's going to

5  get out and it's going to ruin their reputation.

6              MR. WINSBERG:  I mean, there's no evidence of that,

7  Your Honor.

8              THE COURT:  I know.  I know.

9              MR. WINSBERG:  And every borrower says that.  Every

10 borrower that comes into a Court resisting a receiver says the

11 business is finished if you do this, but there's no evidence of

12 that.  And you have to weigh that with the public -- the public

13 has an interest in making sure that they're not engaging in

14 fraudulent conduct and fraudulently ripping off other lenders.

15             You know, there are other means out here.  So we

16 really strongly believe that the management needs to be

17 displaced now.  It's not just with respect to our clients, it's

18 with respect to Ms. Godfrey's client, who's in the courtroom,

19 and the other lenders that believe maybe they had a priority.

20             So the injunction is helpful, but they're -- you

21 know, we still have real concerns that they're going to operate

22 in a way that we really need a receiver to sort this out.

23             And we were envisioning -- because we had thought

24 about this issue, because I know it's a difficult decision for

25 Your Honor, was get a receiver in place, get -- have the
```

1   receiver come back to the Court and do a report and have a

2   further hearing after the receiver figures out what's going on

3   here and --

4           THE COURT:  I'm going to do that kind of.  But I do

5   think I have to look at less severe equitable remedies.

6           You want to say something?

7           MS. GODFREY:  Yes, your Honor, thank you.  I just

8   want to clarify, it's not clear that the accounts that we're

9   talking about are, in fact, the plaintiff's, you know, sole,

10  primary collateral.  And I believe my client would have a

11  priority right to those funds, based upon the lien.

12          THE COURT:  Oh, of course you would.  Yes, because

13  you didn't subrogate over them into that.

14          MS. GODFREY:  Correct.

15          THE COURT:  Okay.  I get it.

16          MS. GODFREY:  Correct, Your Honor.  Thank you.

17          THE COURT:  I get that.  Thank you.  I would like

18  you-all to prepare an order that enjoins the three entities --

19          MR. COHAN:  Your Honor, may I sit?

20          THE COURT:  Yes.  Of course.  I'm sorry.

21          That enjoins the three entities that are the subjects

22  of the three contracts from paying the proceeds on those

23  contracts to anyone other than -- who do you want them paid to?

24          MR. WINSBERG:  We need an independent third party

25  paid to, because Ms. Godfrey's right, there's going to be a

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  dispute as to who's entitled to them.

2          THE COURT:  Okay.  You-all work it out.

3          MR. WINSBERG:  I would suggest having them paid

4  directed to Mr. Glade, as the potential --

5          THE COURT:  That seems reasonable to me.

6          MR. COHAN:  As long as the plaintiff is paying for

7  that, I'm fine with that.

8          THE COURT:  Okay?

9          MR. WINSBERG:  Yeah, I mean, what if we -- our

10  co-counsel is raising the issue, what if one of those three

11  parties claims -- because they're not in front of Your Honor --

12  what if they -- what if they claim they're not really bound by

13  the injunction.

14          THE COURT:  Well, I'm going to expand it, but I doubt

15  they'll do that.  We'll see.  Maybe they will.  But I'm also

16  going to enjoin the defendant and Mr. Smith from doing anything

17  with those funds and require them, if they receive any funds,

18  they must immediately notify and transfer to Mr. Glazer, is the

19  that the name?

20          MR. GLADE:  Glade.

21          THE COURT:  Glade.  Sorry.  That money to Mr. Glade.

22          Everybody understand that?

23          MR. WINSBERG:  Yes, Your Honor.

24          THE COURT:  Third, I'm going to require the defendant

25  to provide to the plaintiff whatever financial records they

EXHIBIT K
PAGE 460

1 think they need in order to look at the other assets and

2 whether there is diminishing or a threat of diminishing in

3 value those items to which you have a claim.  Okay?

4          MR. COHAN:  Understood.

5          THE COURT:  You-all need to figure out the wording of

6 that.  I have the right to order that discovery right now, but

7 I'm going to do it as part of this order.

8          MR. WINSBERG:  Your Honor, in the event that

9 there's -- inevitably, in these types of cases, disputes as

10 to --

11          THE COURT:  You can call me tomorrow at any moment.

12 We're going to get this order out tomorrow.

13          MR. WINSBERG:  Thank you, Your Honor.

14          THE COURT:  I'm not going to let the sun set one more

15 night without putting some protection in place for what I think

16 was supposed to be a pretty easy transaction.  Somebody took $2

17 million, and there's money out there to pay it back.  So I'll

18 be available any time tomorrow.  I will get you-all on the

19 phone and we will hammer out those details.

20          But I would like to get from you-all the guts of the

21 agreement with whatever you want in there, as early as you can

22 tomorrow.  If you have disagreement, redline it, and then we'll

23 all get together and we'll figure out how to do it.  Okay?

24          MR. WINSBERG:  Thank you, Your Honor.

25          MR. COHAN:  Thank you, Your Honor.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
1        THE COURT:  If there is anything else that you think
2   we need to put in there, let me know.
3        But what I think this does for your client is it
4   gives a more precise type of receivership than just letting
5   somebody come in from Atlanta and essentially take over the
6   company.
7        I think this company is doing creative things with TV
8   shows, and I think because of that, they need to stay operating
9   their company.  And this also might be the first baby step.  It
10  may be that you're back here in a little bit and you say,
11  Judge, the discovery has shown that there's all this
12  dissipation and now we have to go to a receiver.  Okay.  I'll
13  do that.
14       MR. WINSBERG:  All right.  Thank you.  Yeah, we would
15  want, as part of that, like in the injunction a negative
16  pledge.
17       THE COURT:  Say again.
18       MR. WINSBERG:  We'd like as part of the injunction a
19  negative pledge where they can't pledge their collateral to any
20  new lenders.
21       THE COURT:  That seems reasonable.
22       MR. COHAN:  Those three companies?
23       MR. WINSBERG:  Yes.  And then we'd also like to have
24  the ability -- you know, like with the documentation, have the
25  ability to have Mr. Smith sit for a deposition.
```

EXHIBIT K
PAGE 462

```
 1              THE COURT:  I think that's reasonable.

 2              MR. WINSBERG:  And maybe have the Court continue the

 3  hearing, you know, depending on what we find.

 4              THE COURT:  That's fine.  I think you've got a lot.

 5  The only concern I have is whether there is a less extreme

 6  equitable remedy, like an injunction, and secondly, whether

 7  what I would be doing is putting the company out of business.

 8              But that's something that if we come back here about,

 9  because you tell me that it's all these other things, I'm going

10  to require the defendant to come here and testify and explain

11  that to me.

12              But I can't just ignore that, especially when we're

13  on fairly short notice.  Okay?

14              MR. WINSBERG:  Thank you, Your Honor.

15              THE COURT:  Anything else you want in there?

16              Do you want to take a minute and talk to your client?

17              MR. WINSBERG:  Just one second, Your Honor.

18              THE COURT:  Yes.  Take a minute and talk to your

19  client.  See if they have any ideas.

20              MR. COHAN:  May I approach the court reporter just to

21  get a rough copy?

22              THE COURT:  Sure.

23                        (Pause in proceedings)

24              MR. WINSBERG:  Thank you, Your Honor.  One additional

25  clarification is the injunction, in dealing with the pledge of
```

1 | the assets and -- it's the collateral, you know, and so to the
2 | extent that that collateral has been moved around outside of
3 | those -- of the borrower entities and the guarantor, if there's
4 | affiliates, like, for example, Hoplite Studios is an affiliate
5 | of the borrowers and made a loan that we allegedly got a
6 | subordination agreement on, the injunction should apply to
7 | their -- to their affiliates.
8 |         THE COURT:  I agree.  I agree.  I agree with you.
9 | And otherwise, you'll be able to do the discovery to see if
10 | there is something else.
11 |         And I really do mean this, Mr. Winsberg, this is open
12 | to adjustment.  If you think that something else needs to be
13 | done to give your client the protection that they want, there's
14 | no reason we can't adjust it to dial it in better until we get
15 | to wherever -- if you decide to come back and you think you
16 | need a receiver, like I said, I'm not putting that outside the
17 | realm of possible.
18 |         I think you have a really good claim for it, but I
19 | think there's just maybe a couple of steps that we can go.
20 | That if I say at the end, I tried to do these other things and
21 | it didn't work, then I know I have to do a receiver.  That's
22 | really the one thing I have.
23 |         So if you decide next week that there's something
24 | that when you're looking at it or when your clients are looking
25 | into something, and they think we think it should be this, let

1    me know.  It doesn't take me but a minute to modify the terms

2    of an injunction.  Okay?  Does that make sense?

3                MR. WINSBERG:  Yes, Your Honor.

4                THE COURT:  Does everybody agree with that?

5                MR. COHAN:  Thank you, Your Honor.

6                THE COURT:  Do you think there's a question about

7    whether or not the other entities will abide the injunction?

8                MR. WINSBERG:  I'm just not sure, Your Honor.  I

9    just -- I would hope that any entity would honor an injunction

10   entered by a federal district court judge, and we wouldn't have

11   a problem.

12               But you don't know.  And the concern here is based

13   upon the fraud, even with the injunction, we are dealing, as

14   the Court has found, with somebody who is untethered to the law

15   at this point.  So we are concerned about compliance and we

16   know there's remedies for that, and -- but we are concerned

17   about they will be operating -- the same person who committed

18   the fraud is going to be operating in the interim, even with

19   the injunction.  That is -- that is a concern.

20               THE COURT:  Well, let's see where we get.  And you

21   can always go get discovery from those third parties and figure

22   out what is happening and what is going to happen.

23               MR. COHAN:  Did you want to say something,

24   Ms. Godfrey?

25               MS. GODFREY:  Yes.  I just want to be clear on what

1   procedures that will follow.  The entry of the Court's

2   injunction, Mr. Blade's holding the funds.  Is the Court

3   anticipating that we come up, like, with a briefing schedules

4   for disbursement or --

5          THE COURT:  Yes.  Well, I think that you ought to

6   say, if you can, in the injunction what happens, right?  I

7   think if we can agree what will happen to the funds, or we can

8   have a hearing on it, you can put that in the injunction, that

9   when there are funds that are collected by Mr. Glade, that the

10  parties will notify the Court and we can decide what to do.

11  And the most important thing is to make sure that nothing

12  happens to it.

13         MR. WINSBERG:  Your Honor, one other thing that came

14  to my attention with the clients, and I do believe it would be

15  helpful here to help us is that the Court to order the defense

16  to let Mr. Glade -- give him access to the premises on

17  reasonable notice to look and inspect the books and records in

18  person, in light of what has gone on here.

19         THE COURT:  Okay.

20         MR. WINSBERG:  Thank you, Your Honor.

21         THE COURT:  Okay.  All right.  Thank you-all.

22

23         (Whereupon, the proceedings were adjourned at 5:07

24  p.m.)

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

EXHIBIT K
PAGE 466

1                    REPORTERS CERTIFICATE

2

3

4          I, Jana B. Colter, Official Court Reporter for the

5   United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on February 10, 2021, in the

9   matter of *Bay Point Capital Partners II, LP v. Hoplite, Inc. et*

10  *al*, Case Number 1:21-CV-375; that said proceedings in

11  connection with the hearing were reduced to typewritten form by

12  me; and that the foregoing transcript (155 Pages) is a true and

13  accurate record of the proceedings.

14          This the 5th day of May, 2021.

15

16

17

18                        _____

19                    /s/ Jana B. Colter, FAPR, RMR, CRR, CRC
                           Official Court Reporter

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

**EXHIBIT K**
**PAGE 467**